508 So.2d 1007 (1987)
Fred A. RODGERS, Jr., et ux., Plaintiffs-Appellants,
v.
NATIONAL DEALER SERVICES, INC., et al., Defendants-Appellees,
DOTD-Office of Highways, Defendant-Appellant.
No. 18725-CA.
Court of Appeal of Louisiana, Second Circuit.
June 10, 1987.
Rehearing Denied July 9, 1987.
Charles W. Seaman, Natchitoches, for plaintiffs-appellants.
John W. King, Baton Rouge, for DOTD-Ofc. of Highways, for defendant-appellant.
*1008 Cook, Yancey, King & Galloway by Benjamin C. King and Benjamin C. King, Jr., Shreveport, for George S. Dement and Bill Hanna Ford, Inc., for defendants-appellees.
Before HALL, C.J., and MARVIN and LINDSAY, JJ.
MARVIN, Judge.
From a judgment awarding almost $283,000 damages and allocating fault 60 percent to the State DOTD and 40 percent to the driver of a car that went out of control in an improperly marked and dangerous curve on a state highway, these appeals were taken by DOTD, by Rodgers, the plaintiff-passenger in a pickup who suffered injury when the car collided with the pickup, and by Rodgers' wife.
DOTD seeks to reverse the judgment insofar as it finds DOTD's fault caused or contributed to the accident. Rodgers seeks to increase the damage award and to recover damages for loss of future earnings. Rodgers' wife seeks to increase the $7,500 that was awarded her for loss of consortium.
We amend to allow damages for loss of earning capacity. Folse v. Fakouri, 371 So.2d 1120 (La.1979). As amended, and in all other respects, we affirm.

SCOPE OF REVIEW
We review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Allocation of fault is a factual finding which an appellate court does not disturb unless, upon articulated and detailed analysis and reasons, that finding is demonstrated to be clearly wrong. Reck v. Stevens, 373 So.2d 498 (La.1979); Abraham v. Hanover Ins. Co., 420 So.2d 526 (La.App. 2d Cir.1982); Triangle Trucking Co. v. Alexander, 451 So.2d 638 (La.App. 3d Cir.1984); Thomas v. Missouri-Pacific R. Co., 451 So.2d 1152 (La.App. 3d Cir. 1984); Varnado v. Continental Ins. Co., 446 So.2d 1343 (La.App. 1st Cir.1984).
A trier of fact may accept or reject in whole or in part either the opinions of experts such as an accident reconstruction expert, or the testimony of other witnesses who are not experts but who were involved or were present at the scene. Tyler v. Richardson, 476 So.2d 899 (La.App. 2d Cir. 1985). We find no error in the trial court's assessment of the evidence.

FACTUAL FINDINGS
The trial court's conclusions that DOTD had not posted a speed limit sign or a curve sign and had not "recently" painted readily-visible edge lines on the highway are clearly supported by the DOTD witnesses and records. The highway became a part of the state highway system April 27,1982. The accident occurred at 10:20 p.m. on March 3, 1983. The highway was not "striped" between July 1982 and April 1984. No signs were installed or erected on the highway before September 20, 1983. DOTD's inspector was not informed that the highway had become a part of the state highway system until August 22, 1983. DOTD did not inspect the highway as it is required to do until on or after August 22, 1983.
The curve was downhill from the negligent car driver and was difficult to see at night. Twenty similar accidents had occurred at the unmarked curve in about eight years when a motorist found himself or herself in the curve at an unsafe speed and lost control of the vehicle.
We agree with the analysis of DOTD and of the trial court that shows the car driver was negligent in his speed, observation, and control of his automobile. We do not agree with DOTD's contention that it was not at fault in causing the accident.

DOTD'S FAULT
DOTD did not comply with its Manual for Uniform Traffic Control Devices in this instance as LRS 32:235(A) requires and did not timely act between April 27, 1982, and August 22, 1983, to determine what control devices were needed on this highway. Hatcher v. State, Through Dept. of *1009 Transp. & Dev., 467 So.2d 584 (La.App. 3d Cir.1985).
DOTD owes a duty to highway traffic to warn of a dangerous curve. A motorist is not required to anticipate a curve to which his attention is not directed. Craft v. Caldwell Parish Police Jury, 455 So.2d 1226 (La.App. 2d Cir.1984). The governing agency is not relieved of its duty to erect warning signs because the motorist was negligent. DOTD's duty extends to protect even the negligent motorist. Gadman v. State, Through D. of Transp. & Dev., 493 So.2d 661 (La.App. 2d Cir.1986).
In Gadman, supra, we recognized the presumption that a motorist will obey an appropriately placed sign warning of a dangerous curve as well as DOTD's burden to rebut that presumption. We also increased the allocation of fault to DOTD from 60 percent to 75 percent, while lowering the motorist's fault from 40 to 25 percent. Compare Ledbetter v. State, Thru Dept. of Transp. & Dev., 502 So.2d 1383, 1388 (La.1987), where it was noted that "adequate warning," more likely than not, would have prevented the accident. We apply Ledbetter's reasoning here:
"[The] total lack of any warning signs whatsoever was a cause-in-fact of the accident. Since the Department had a duty to warn ... and since the risk to plaintiff was within the scope of that duty, the Department's breach of that duty ... was a concurrent legal cause of the accident.
* * * * * *
We cannot say that the allocation of sixty percent fault to the Department was not just and proper on the record, and we would not have granted certiorari on this issue alone."
The essence of DOTD's argument is that the trial court was clearly wrong in not accepting the testimony of DOTD's accident reconstruction expert that the car never left the paved roadway and was traveling in excess of 65 mph. Conflicting testimony by others who were involved in the accident and by the officer who investigated the accident, as well as photographs in the record, which were accepted as credible by the trial court, established that the pickup had been driven onto the right shoulder of the highway in an attempt to avoid the out-of-control car and that the car was not being driven in excess of 65 mph and was off the highway when the left side of the car struck the left front side of the truck.
We adopt the trial court's reasons allocating fault which we have here summarized. The trial court's reasons are clearly supported by the law and the record.

QUANTUM
The trial court awarded Rodgers damages in the amount of $275,437.77 and awarded $7,500 to his wife for her loss of consortium. Rodgers' damages were itemized by the trial court as follows:

Pain, suffering and disability $120,000.00
Loss of past income 81,608.79
Past medicals 41,295.20
Future medicals 25,033.80
Loss of future services 7,500.00
 ___________
total $275,437.77

PAIN-DISABILITY
Rodgers argues that the trial court's general damage award was too low and an abuse of discretion. Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion. To make this determination we look first, not to prior awards, but to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to this case and this individual may we conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Ins. Co., 467 So.2d 867 (La.App. 2d Cir.1985). Prior awards under similar circumstances serve only as a general guide. In such review, we determine whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See Reck v. Stevens, supra; Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987).
The night of the accident, March 3, 1983, Rodgers was taken to Willis-Knighton Hospital where he was examined by Dr. Joffrion, *1010 who diagnosed a fracture dislocation in the right pelvis area and abdominal bleeding. Rodgers' abdominal bleeding delayed surgery on his pelvis. The bleeding was treated by the insertion of a nasogastric tube. On March 10, surgery was performed by Dr. Joffrion to repair the fractured hip by opening the hip joint and inserting bone screws. Rodgers' leg was in traction after the surgery to remove pressure from the hip joint. Upon release from the hospital on March 25, Rodgers was required to use crutches and continued taking medication for pain.
On May 13, 1983, Rodgers was again admitted to Willis-Knighton. A CAT scan revealed that a bone screw had loosened and migrated into the hip joint. A second surgery was performed by Dr. Joffrion which involved re-opening the hip through the previous incision and removing the bone screw. Rodgers continued seeing Dr. Joffrion on a frequent basis. On August 8, 1983, Rodgers complained of severe and increasing pain. X rays showed narrowing of the hip joint space caused by loss of cartilage. Dr. Joffrion performed surgery to accomplish total hip joint replacement on October 25, 1983. The ball and neck of the femur were removed and an artificial ball and socket were inserted to create a new hip joint. Rodgers was discharged from the hospital on November 4, 1983.
Rodgers continued seeing Dr. Joffrion throughout 1984 and 1985 through the time of trial. In June 1984, Dr. Joffrion noticed that Rodgers' left leg was approximately two-thirds of an inch shorter than his right. Dr. Joffrion stated that this discrepancy was in part caused by the surgery and in part was congenital. A prescribed heel lift did not relieve Rodgers' problem. His gait was less smooth and the heel lift put more pressure on the hip prosthesis. On November 13, 1984, Rodgers was again admitted to the hospital with complaints of back pain which were related to the accident. He was hospitalized for six days and underwent a myelogram.
Each of Rodgers' three surgeries were painful. He was hospitalized for about 45 days and saw his treating physician some 30 times prior to trial. Dr. Joffrion assessed a 35-40 percent permanent partial disability of the right leg as a whole and stated that Rodgers would not be able to do excessive walking, stooping or climbing, and would have difficulty sitting or standing for long periods of time.
Rodgers' total medical bills at the time of trial were in excess of $60,000. Future medical treatment will be necessary and may include surgical implantation of a new hip prosthesis. Rodgers has used and may permanently have to use either crutches or a cane to assist him when walking. Dr. Joffrion stated that Rodgers will continue to suffer some permanent degree of pain in the future which will require medication.
In Thompson v. T G & Y Stores Co., 448 So.2d 895 (La.App. 3d Cir.1984), the court affirmed an award of $60,000 to an 82-year-old woman who sustained a fractured hip. Surgery was performed on two occasions, once to insert a prosthesis, and secondly to completely replace the hip joint. She was hospitalized for 28 days. As a result of her injuries and problems with the prosthesis, her activity was severely curtailed. Her pain was permanent and continuing and she was required to use a walker.
In Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2d Cir.1983), the plaintiff was a 57-year-old woman who sustained a hip fracture and a serious knee injury. Two operations were performed on her hip and knee and required hospitalization for 35 days. Future knee surgery was likely and she suffered a significant permanent disability of her leg. We found the general damage award of $125,000 not to be excessive.
The cases of Pawlak v. Brown, 430 So.2d 1346 (La.App. 3d Cir.1983), and Burgess v. City of Shreveport, 471 So.2d 690 (La.1985), cited by plaintiff, involved injuries and treatment fairly similar to that of Rodgers. In both cases, the plaintiffs were awarded $200,000 in general damages. However, each case must be decided on its own facts and circumstances and as we have noted, prior awards serve as only a general guide. See Wactor, supra. Considering *1011 the totality of the evidence, we find no abuse of discretion in the trial court's general damage award of $120,000.

LOSS OF EARNING CAPACITY
The trial court failed to make an award for future loss of income, noting that Rodgers had worked in a supervisory capacity during late 1984 and the first six months of 1985. Rodgers retired prior to trial, explaining that he was no longer physically able to run his business. The trial court noted that Rodgers' business was financially successful during this time.
The record shows that Rodgers and his wife owned a construction business, specializing in the construction and renovation of service stations. Rodgers was actively involved in all phases of the business. He prepared bids for potential jobs and supervised the jobs once they were obtained. Rodgers was required to physically inspect the proposed jobsites. This involved a great deal of travel back and forth to the jobsites, and walking, stooping and bending to obtain information necessary to submit a bid. Rodgers climbed, walked on uneven surfaces, and performed manual labor from time to time to supervise and assist his employees during construction work.
Before the accident, Rodgers was a hardworking, diligent man who had no serious health problems and who actively worked in his construction business. Dr. Richard Galloway, a vocational rehabilitation expert who tested Rodgers, testified that Rodgers would be unable to do the same type of work he did before the accident. Galloway further stated that because of his age and other factors, Rodgers would likely be unable to work in a different vocation in the future. Rodgers was 63 years old when the accident occurred.
Dr. Joe Ben Hayes, a psychiatrist who first saw Rodgers in August 1984, continued to see him approximately twice a month prior to trial. Dr. Hayes testified that Rodgers would probably continue to require his treatment for at least six months after trial. Dr. Hayes said that Rodgers was an emotionally stable man before the accident, but that he became extremely depressed after, because of his inability to do the things he had done before. Rogers experienced a decreased sexual motivation and became irritable. Dr. Hayes attributed Rodgers' emotional problems to the accident, and explained that although Rodgers' condition had improved somewhat, he advised him not to try to go back to work.
We find that the trial court erred in failing to make an award for loss of earning capacity. A loss of future income award is not predicated merely upon the difference between a plaintiff's earnings before and after a disabling injury, but also encompasses the loss of one's earning potential the loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense. See Folse v. Fakouri, supra; Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984).
An award for future loss of earnings is inherently speculative and cannot be calculated with absolute certainty. The most that courts can do is exercise sound discretion and make an award that in the light of all facts and circumstances is fair to both litigants while not being unduly oppressive to either. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir. 1982); Viator v. Gilbert, 216 So.2d 821 (La.1968).
A number of factors are pertinent to the determination. Loss of future income, life expectancy, work life expectancy, discount and inflation rates, physical condition before and after the injury, past work record, and the amount plaintiff probably would have earned absent the injury complained of, must be considered. Unbehagen, supra; Morgan v. Willis-Knighton Medical Center, supra. Compare Wactor, supra.
Rodgers resumed working during the two year period before trial but under difficult circumstances. He testified that he was forced to retire because he was no longer physically able to perform his job. His business showed a net income in 1982, the year before the accident, of about $44,000. *1012 In the first six months of 1985, his business showed a net income of approximately $64,000. The trial court reasoned that this increase in income indicated that Rodgers had experienced no loss of earning capacity. We must respectfully disagree. The evidence shows that Rodgers' capacity to actively perform the work he did prior to the accident was substantially diminished. That Rodgers continued to try and manage his business for a time, even while injured, is to his credit. That his business was successful during this time does not change the fact that he was forced to retire because of his disability. His earnings in 1984 and 1985 derived primarily from inspections and bids he made before the accident.
Plaintiff's economic expert, Dr. Thames, testified that Rodgers had a future economic loss of approximately $475,000. Dr. Thames, however, included future medical costs of $34,000 and $110,000 for loss of household services in this amount. In addition, Thames' estimation was based on Rodgers having a remaining work life expectancy of 11.6 years. We find these figures to be unrealistic and unsupported by the evidence. Plaintiff argues that the trial court's award of $7,500 for his loss for inability to do household services should be increased. We shall not disturb this award.
The plaintiff's net income was shown to have averaged $51,000 annually for the five-year period before the accident. The evidence supports the conclusion that Rodgers could and would have worked at least an additional three years beyond 1985 had it not been for his disability. Any award for loss of earning capacity, of course, is made as a projection or estimate of what might have been. Considering all the circumstances of this plaintiff we deem $100,000 for loss of earning capacity would be a fair and just award. Any projection beyond three years is not justified. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976)

LOSS OF CONSORTIUM
Rodgers' wife complains that the award of $7,500 for loss of consortium is too low. The trial court noted that Rodgers' injuries had caused a strain in the couple's relationship, in that Rodgers had become irritable, depressed, and had experienced a diminished sexual motivation. In Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985), we affirmed an award of $5,000 to a wife whose husband suffered a serious aggravation of pre-existing injuries that left him unable to continue his trade as a boilermaker. While probably on the lower end of the discretionary scale, we do not find the award so low as to constitute an abuse of discretion, and affirm this part of the judgment.

DECREE
We amend to award Fred Rodgers, Jr. $100,000 for loss of earning capacity. Costs of the appeal, to the extent legally permitted, are assessed against appellant, DOTD. In all other respects, the judgment is AFFIRMED.