639 So.2d 361 (1994)
Sandra T. CHAMBERS, Plaintiff-Appellant,
v.
Jed B. GRAYBIEL, Aetna Life & Casualty Insurance Company, Thomas Courtney, Jr., Zurich Insurance Company, and State Farm Mutual Automobile Insurance Company, Defendants-Appellees.
No. 25,840-CA.
Court of Appeal of Louisiana, Second Circuit.
June 22, 1994.
*363 Rellis P. Godfrey, Shreveport, for appellant.
Mayer, Smith & Roberts by George T. Allen, Jr., Shreveport, Lunn, Irion, Johnson, Salley & Carlisle by Marshall R. Pearce, Shreveport, for appellees.
Before NORRIS, LINDSAY and HIGHTOWER, JJ.
NORRIS, Judge.
Sandra Chambers, who was driving the lead car in a three-vehicle rear-end collision, appeals a jury verdict that absolved her of fault, allocated fault between the two following vehicles, and awarded what she contends to be inadequate damages. She contests the jury verdict form, the allocation of fault and the damages. Her uninsured motorist ("UM") carrier, State Farm, answers the appeal, contesting the allocation of fault and seeking to preserve a subrogation claim. The insurer of the car immediately behind Ms. Chambers, Zurich Insurance Company, also answers the appeal, contesting the allocation of fault. For the reasons expressed, we find no error in the verdict form or the allocation of fault and therefore affirm the judgment in those regards. However, we amend the judgment to increase the medicals from the $1,500 awarded by the jury to the amount demonstrated at trial to have resulted from the accident, and to award general damages which the jury denied for Ms. Chambers's soft-tissue injury and temporary aggravation of a preexisting condition. The judgment is also amended to honor State Farm's cross claim.

Factual background
The accident occurred on the late afternoon of July 15, 1988. Ms. Chambers, a "shift manager" or assistant manager at the Hardee's restaurant in Vivian, had just left work after her 11 a.m.-7 p.m. shift. She was driving north on Louisiana Hwy. 1, a two-lane blacktop road, in her boyfriend's 1979 Mustang. She estimated she was driving 40-45 mph in traffic that was "not real heavy" as she approached a line of vehicles that had stopped because, she assumed, someone was waiting to make a left turn. Then, however, the truck in front of her stopped abruptly, so she slowed and stopped. She testified that without warning (no squealing tires) she was hit from behind by a 1983 Lincoln Mark VI driven by defendant Thomas Courtney and insured by Zurich. Ms. Chambers testified that she was thrown forward and, because she was wearing her safety belt, back into the seat, with an immediate burning sensation in her neck. Glancing into her rear view *364 mirror, she then saw the Lincoln coming forward again, and it struck her a second time. The second impact, she testified, not only affected her back and neck, but also caused her foot to twist off the brake or clutch.
Mr. Courtney testified that he was following the Mustang at a safe distance when the traffic ahead came to a complete and sudden stop. He hit his brakes and made his tires squeal, but he testified that he stopped his car before it struck Ms. Chambers in the Mustang. At trial he estimated he stopped five to 10 feet behind her; in deposition he said it was three to five feet. After he completed the stop, Mr. Courtney was struck from behind by a 1988 Pontiac Grand Prix driven by defendant Jed Graybiel and insured by Aetna. This impact, according to Courtney, propelled him into Ms. Chambers's Mustang. Mr. Courtney, as well as the three passengers in his car, were adamant that the Mark VI stopped safely and completely without hitting the Mustang, and made contact with the Mustang only after being struck by the Pontiac.
Mr. Graybiel admitted he was driving at 50-52 mph and saw the traffic slowing ahead, but claimed that the bright sun just below the treeline was a factor in his failure to stop. He insisted that when he struck the Mark VI, it had not come to a complete stop. He denied hearing any squealing brakes, but admitted that he was driving with his windows up, air conditioner and radio on. One of his passengers, Michael Beard, testified that from his vantage point it was impossible to tell if Courtney struck Ms. Chambers first.
Except for Ms. Chambers, everyone involved described the impacts as relatively minor. This included Graybiel and his two passengers, and Courtney and his three. Courtney also testified that he did not sustain "much" damage to his Mark VI. Both defendants denied that the Mustang was damaged, but Ms. Chambers's boyfriend, Robert Smith, who owned the car, testified that a body shop wanted about $900 to repair it. Nevertheless the car was driveable and they never got the car repaired; Ms. Chambers continued to drive it to work until, she said, her leg pain made it too difficult for her to use the clutch.
Ms. Chambers testified that immediately after the accident her shoulders and neck were hurting; however, she declined an ambulance when offered. Her boyfriend, Robert Smith, arrived 20-25 minutes later, found her "nearly hysterical," and drove her back home. After 30 minutes of trying to relax, however, she claims to have felt burning in her ears, and asked Robert to take her to the hospital. At the Willis-Knighton emergency room she was X-rayed and given a shot and a prescription. She woke up the next morning with pain in her shoulders, neck and lower back, so she made an appointment with her chiropractor, Dr. Wojcik. Dr. Wojcik had treated Ms. Chambers fairly often over the prior three years for, at different times, pain in both hips, pain and stiffness in the shoulders and arms, and pain in the mid-back extending into the chest and left arm. After a softball injury in 1985, Dr. Wojcik had referred her to a local rheumatologist, Dr. Burda, who diagnosed fibrositis. When Dr. Wojcik saw Ms. Chambers three days after the accident, he diagnosed a cervical sprain or strain injury of the neck, with upper thoracic complaints as well. He referred her to an orthopedist, Dr. J.E. Smith, who also diagnosed a musculoligamentous strain. Dr. Wojcik testified that an injury of this sort should usually resolve in six to eight weeks, and admitted that by August 23 Ms. Chambers's range of motion was "essentially normal." However, he continued to treat her for about three months using moist heat, massage and electropads, but she persisted in her complaints of pain. Feeling he was not making any progress, he referred her to the arthritis clinic, where she saw Dr. Susan Williams, an internist and rheumatologist.
Dr. Williams testified at length about her treatment of Ms. Chambers, which continued from October 1988 through October 1990, with a follow-up visit just before trial in April 1992. Dr. Williams found several "tender points" and diagnosed fibrositis or fibromyalgia, as well as a possible carpal tunnel syndrome. She instructed Ms. Chambers to do exercises and prescribed various medicines. She also sent Ms. Chambers to physical therapy, *365 but this proved to be largely ineffective; she doubted that Ms. Chambers was really "following orders." Because of the possible carpal tunnel problem, she sent Ms. Chambers for a nerve conduction test, which was normal. Through the months Ms. Chambers's complaints gradually increased. For example, in addition to the shoulder, neck and back pain that she reported to Dr. Williams on her initial visit, in November 1988 she complained of clumsiness in her left hand; in December, headaches, pain in the right hip, and tingling in her right thumb and index finger; in February 1989, pain in the middle of both thighs; in May, pain in her left jaw, both wrists and both shoulders; in June, aching in both hands; in July, feelings of weakness and frequent headaches; in October, a rash on her cheeks, hives, and sticking pains in her chest; in January 1990, burning pain in her upper abdomen; in August 1990, pain in her upper and lower extremities. Dr. Williams has almost constantly had Ms. Chambers on an antidepressant drug such as Amitriptylene, Desyrel or Prozac. She testified that after the follow-up visit of April 1992, Ms. Chambers was no better off than when she first came in. Although all the objective tests run on Ms. Chambers (X-rays, nerve conduction, arthritis) were negative, Dr. Williams accepted her complaints of the tender points and concluded that Ms. Chambers suffered from a permanent condition of fibrositis.
On cross examination, Dr. Williams admitted that Ms. Chambers had not been totally forthcoming in reporting her prior medical problems, including 1983 reports of "persistent" neck soreness and headaches; a "long history" of pain in her right lower back, including hospitalization in 1983; Dr. Burda's diagnosis of fibrositis in 1985; pain in the lower back, hip and thigh after lifting a heavy object in 1987; and a prior history of hives. Dr. Williams also admitted that Ms. Chambers's employment in the fast food business could have contributed to many of her symptoms. Ultimately, Dr. Williams declined to state that the accident of July 1988 caused Ms. Chambers's symptoms, but testified, somewhat reluctantly, that the accident may have aggravated them.
Because Ms. Chambers had complained of pain in her jaw some 10 months after the accident, Dr. Williams referred her to Dr. Perry Hollembeak, a dentist and temporomandibular joint ("TMJ") specialist. Dr. Hollembeak first saw Ms. Chamberss in November 1990, 16 months after the accident, and diagnosed bilateral disc displacement of both jaw joints, which "certainly within reason" could have happened in the accident. However, he admitted that traumatic TMJ injuries usually manifest within "up to several weeks," and that he would have expected these symptoms sooner after the accident. He also admitted that her poor dental condition before the accident, including malocclusion and several missing teeth, could have contributed to the problem. He made two appliances (one for day, one for night), which Ms. Chambers was still wearing at the time of trial, but felt that she would always suffer some degree of pain. He would not project the cost of future medical treatment for the jaw.
Pursuant to the "Med-Pay" provision of its policy with Ms. Chambers, State Farm paid $5,000 of her medicals.
Despite her ongoing complaints of pain, Ms. Chambers did not miss much time from Hardee's as a result of the accident. She testified that she requested two days' leave immediately after the accident, and then, months later when she started the unsuccessful physical therapy, about six weeks. At the time of the accident she was a shift manager or assistant manager, with supervision over eight to 20 employees. She was promoted to full manager in July 1990, two years after the accident. She testified, however, that her continuing pain (and the pressure of the work) made it impossible for her to do her job so she was fired in June 1991. Her former coworker, Shirley Smith, corroborated that after the accident Ms. Chambers's attitude changed and she seemed to be in pain. Ms. Chambers's boyfriend, Robert Smith, testified that while she was working, she usually came home in pain, and her activities have been abridged. Ms. Chambers admitted, however, that she had earned more money after the accident than before. She had not worked since she left Hardee's, *366 but at the time of trial was enrolled at the Vo-Tech in culinary arts.

Procedural background
Ms. Chambers filed her suit against the tortfeasors, Thomas Courtney and Jed Graybiel, and their respective insurers, Zurich Insurance Company and Aetna Life and Casualty; and against her UM carrier, State Farm. The defendants brought several incidental actions, most of which are not essential to this opinion. Notably, however, State Farm cross claimed the other defendants for reimbursement of the Med-Pay it had advanced to Ms. Chambers; State Farm also requested a jury trial. After the first day of trial, Graybiel and Aetna announced they had settled with Ms. Chambers; the trial continued to resolve the allocation of fault. At the close of evidence, Ms. Chambers objected to the court's verdict form as to "cause of this accident" and "legal cause of damages"; we will discuss this with her first assignment of error.
The jury returned a verdict finding both Thomas Courtney and Jed Graybiel guilty of negligence in causing the accident; it assessed fault 20% to Courtney and 80% to Graybiel. However, the jury also found that the defendants' negligence was not the legal cause of Ms. Chambers's damages. The jury completely denied her claims for pain and suffering and future medical expenses, but awarded $1,500 for past medical expenses and $400 for lost wages and earning capacity. The trial court denied her motion for JNOV, additur or new trial, and rendered judgment pursuant to the verdict. By this judgment Ms. Chambers recovered $80.00 on her principal demand, and State Farm recovered $300.00 on its cross claim, against Courtney and Zurich; and her UM claim against State Farm was dismissed.

Applicable law
The law authorizes the trial court to require a jury to return only a special verdict in the form of special written findings upon each issue of fact. La.C.C.P. art. 1812 A. Thus the court may submit to the jury written questions susceptible of categorical or other brief answer. Id.; Lemire v. New Orleans Pub. Serv. Inc., 458 So.2d 1308 (La. 1984). The statute particularly authorizes the court to submit questions as to whether a party from whom damages are claimed was at fault, and if so, whether such fault was a legal cause of the damages. Art. 1812C(1)(a); Pacholl v. State Farm Mut. Auto. Ins. Co., 527 So.2d 1154 (La.App. 3d Cir.1988). The special verdict form should not, however, probe the difficult distinction between "cause in fact" and "legal cause" of an accident. Weaver v. Valley Elec. Membership Corp., 615 So.2d 1375 (La.App. 2d Cir.1993). This is because "legal cause" is a question of whether a legal standard of care exists to protect the plaintiff against the particular risk of harm. Id., at 1381, 1386; see also Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
Louisiana law requires a motorist not to follow another vehicle closer than is reasonable and prudent, having due regard for the speed of such vehicle, the traffic conditions and the condition of the highway. La.R.S. 32:81; State Farm Mut. Auto. Ins. Co. v. Hoerner, 426 So.2d 205 (La.App. 4th Cir.1982), writ denied 433 So.2d 154 (1983). When a following vehicle rear-ends a vehicle ahead of it, the following vehicle is presumed at fault and must prove a lack of fault to avoid liability; he may do so by establishing that he had his vehicle under control, closely observed the lead vehicle, and followed at a safe distance under the circumstances. Ivy v. Freeland, 576 So.2d 1117 (La.App. 3d Cir. 1991). Generally, when other vehicles are able to stop behind the lead vehicle, the last one which precipitates the chain reaction is negligent. Staehle v. Marino, 201 So.2d 212 (La.App. 4th Cir.1967).
A judgment notwithstanding the verdict ("JNOV") is appropriate when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court finds that reasonable men could not arrive at a contrary verdict. La.C.C.P. art. 1811. If there is evidence opposed to the motion for JNOV of such quality and weight that reasonable and fair-minded men, in the exercise of impartial judgment, might reach different conclusions, the motion should be *367 denied. Anderson v. New Orleans Pub. Serv. Inc., 583 So.2d 829 (La.1991). In considering the motion for JNOV, the trial court should not evaluate the credibility of witnesses, or substitute its own reasonable inferences of fact for the jury's as long as reasonable inferences can be made to support the jury's verdict. All reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Id.; Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir.1993). The JNOV is the procedural vehicle for raising or lowering an unreasonable damage award. La.C.C.P. art. 1811 F; Sumrall v. Sumrall, supra. Denial of a motion for new trial is discretionary with the trial court and should not be disturbed absent an abuse of discretion. Gibson v. Bossier City Gen'l Hosp., 594 So.2d 1332 (La.App. 2d Cir.1991).
A court of appeal may not set aside of trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. Esco, 549 So.2d 840 (La.1989). Thus the appellate court does not question whether the trier of fact was right or wrong, but whether the trier's conclusion was a reasonable one. Stobart v. State through Dept. of Transp., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and inferences of fact should not be disturbed on review where conflict exists in the testimony. Id.; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial court's allocation of fault is also subject to the manifest error rule. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. La.C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Only after finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries Inc., 341 So.2d 332, 335 (La.1977).
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the accident and the injuries complained of. American Motorist Ins. Co. v. American Rent-All, 579 So.2d 429, 433 (La.1991). A defendant takes the plaintiff as he finds her and is responsible for all natural and probable consequences of his tortious conduct. When the defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of her aggravation. Perniciaro v. Brinch, 384 So.2d 392 (La.1980). Whether the accident caused the plaintiff's injuries is a factual question which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973, 979 (La. 1991).
It is error of law to award special damages for medical expenses and nothing for personal injury, pain and suffering; JNOV is the suitable means of correcting this error. Sumrall v. Sumrall, 612 So.2d at 1015; Odendahl v. Wild, 418 So.2d 36 (La. App. 4th Cir.1982). Medical expenses are a proper item of damages. Thames v. Zerangue, 411 So.2d 17 (La.1982). A jury is in error for failure to award the full amount of medical expenses proven by the victim. Sumrall v. Sumrall, 612 So.2d at 1014; Labauve v. Central Mut. Ins. Co., 491 So.2d 146, 148 (La.App. 3d Cir.1986), and citations therein. A tortfeasor is required to pay for overtreatment or unnecessary treatment unless the victim incurred these expenses in bad faith. Sumrall v. Sumrall, supra; Starnes v. Caddo Parish Sch. Bd., 598 So.2d 472 (La.App. 2d Cir.1992).
Impairment of the plaintiff's earning capacity is also a valid item of damages. Folse v. Fakouri, 371 So.2d 1120 (La. 1979). Such damages are measured by the plaintiff's ability to earn rather than on what she actually earned prior to the accident. In other words, damages may be assessed for the deprivation of what the plaintiff could have earned even though she may have never seen fit to avail herself of that capacity. Id., at 346. Damages may even be appropriate if *368 the jury finds that the plaintiff is unable to pursue her business as vigorously and energetically as she did prior to the accident. Hobgood v. Aucoin, 574 So.2d 344, 348 (La. 1990). However, the jury's decision to award or withhold such damages falls within the jury's great discretion. Id.

Discussion: Verdict form
By her first assignment Ms. Chambers urges the trial court erred in including in the jury verdict form the question whether a party's negligence was the "legal cause" of the damages. She argues that she objected to the form on grounds that the first question, pertaining to negligence, was a fact question, while the second, pertaining to legal cause, was a legal question outside of the province of the jury. In support she cites this court's discussion in the recent case of Weaver v. Valley Elec. Membership Corp., 615 So.2d 1375 (La.App. 2d Cir.1993). In that case we reversed a judgment which was:
based on the jury's answers to interrogatories which first declared that the defendant power company, VEMCO, was negligent, but secondly and on the other hand, that VEMCO's negligence was not a "legal cause" of the accident. (emphasis added)
She finally contends the jury charge was inadequate to explain the verdict form.
Mrs. Chambers is correct in her reading of Weaver. There we discussed at some length the jurisprudence that separates the factual question of cause in fact from the legal question of legal cause. See Dixie Drive It Yourself Sys. v. American Beverage Co., supra; Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60 (1956); Robertson, Reason Versus Rule In Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates Inc., 34 La.L.Rev. 1 (1973). We reversed the judgment in Weaver because "[t]he jury's verdict and the trial court's ruling on the legal `cause' issue were wrong" in finding that the defendant's duty did not extend to protect the plaintiff from the particular risk of harm encountered, or that the plaintiff's negligence excused the defendant's conduct. 615 So.2d at 1386.
Ms. Chambers is incorrect, however, in her reading of the instant verdict form. These questions do not ask the jury to differentiate between cause in fact and legal cause of the accident. Rather, they ask for a factual finding of "negligence which was the cause of this accident" and then a factual question of whether this negligence was a "legal cause of damages." This phraseology precisely tracks the language of the Code of Civil Procedure for special verdicts. La.C.C.P. art. 1812C(1)(a). Moreover, the court charged the jury as to "legal cause of any injury and consequent damage the plaintiff may have sustained" in the context of the preexisting condition and the potential comparative negligence. R.p. 775. Taken as a whole, the verdict form and the jury charge adequately explain that in order to find liability, the jury must find that the defendants were negligent and that this negligence caused the damages complained of. American Motorist Ins. Co. v. American Rent-All, supra. The trial court was not in error to use this verdict form.
We note, nevertheless, an inconsistency in the jury's responses to the verdict form, properly addressed in Ms. Chambers's seventh assignment of error. It is obviously illogical to find that neither Thomas Courtney's nor Jed Graybiel's negligence caused the plaintiff's damages, and then to assess fault to those defendants and award damages. An inconsistent verdict, however, must be read as a whole, with the rule that the judgment shall be just, legal and proper upon the record on appeal. La.C.C.P. art. 2164; Parliman v. Kennelly, 520 So.2d 445 (La. App. 5th Cir.1988). The court may refer to the entire record to construe an ambiguous verdict. Rodrigue v. Ziifle, 288 So.2d 630 (La.1974). As we shall discuss on the issue of quantum, this record posed serious questions of preexisting injuries and the extent to which Ms. Chambers's post accident complaints may have antedated the accident. A fair interpretation of this verdict form is that the jury found the accident did not cause the majority of Ms. Chambers's complaints, but only a small portion of them. See Parliman v. Kennelly, 520 So.2d at 446-447. We will read the judgment this way when we review it for manifest error and inadequate damages.
*369 Ms. Chambers's first assignment of error, however, lacks merit.

Allocation of fault
By her eighth assignment of error Ms. Chambers urges the trial court erred in denying her motion for JNOV, additur or new trial when the jury allocated fault 80% to Graybiel and only 20% to Courtney. She suggests that the proper allocation between the two defendants should be 50% each. By their answers to appeal, Zurich (Courtney's insurer) and State Farm (Ms. Chambers's UM carrier) also contest the allocation of fault. Zurich contends that Graybiel's conduct was the sole cause of the accident, and that Courtney should be absolved; State Farm argues that Graybiel should be absolved, that some fault should be assessed to Ms. Chambers, and "greater fault" assessed to Courtney.
Ms. Chambers has framed her assignment in terms of the denial of her motion for JNOV, additur or new trial, but the disposition of these motions is discretionary with the trial court. The grant of JNOV is proper only when the trial court finds no legitimate or substantial evidence to support the verdict. Gibson v. Bossier City Gen'l Hosp., 594 So.2d at 1336. Given the widely divergent accounts of how the accident occurred, the trial court was completely within its discretion to deny the instant motions as to fault. The issue is whether the allocation of fault is plainly wrong under the manifest error standard. Rosell v. Esco, supra; Towns v. Georgia Cas. & Sur. Co., supra.
Ms. Chambers testified that she "started slowing down and then I came to a stop." Mr. Courtney, however, testified that the traffic in front of him "came to a complete and sudden stop", and his front-seat passenger, Mr. Abney, stated that "all of a sudden this car stopped in front of us." Mr. Graybiel, who may have been partly blinded by the sun, testified he saw no reason for Ms. Chambers to stop.
Ms. Chambers testified that Courtney's Lincoln hit her twice, suggesting that the first impact was on its own power and the second by propulsion from Graybiel's Grand Prix. Mr. Courtney, however, was adamant that he stopped with difficulty but safely behind Ms. Chambers's Mustang, and struck her only after he was pushed forward by the Grand Prix; every one of his passengers corroborated this. Neither the investigating officer, Deputy Frake, Ms. Chambers nor Mr. Graybiel saw the skid marks that Mr. Courtney claims to have made with his squealing tires, but everyone admitted that all three cars pulled off the road and did not mark the exact location of the collisions. Mr. Graybiel could not say whether the Lincoln hit the Mustang before he hit the Lincoln.
On this widely divergent testimony, a reasonable factfinder could have found that Ms. Chambers made a sudden stop, thus depriving her of the presumption of innocence in the rear-end case. Ivy v. Freeland, supra. A reasonable factfinder could have found that Courtney was keeping a safe distance behind Ms. Chambers and came to a complete stop after her. State Farm v. Hoerner, supra. A reasonable factfinder could also have found that Graybiel, as the last driver in the chain, was solely responsible for the accident. Staehle v. Marino, supra.
The record, however, permits an equally reasonable finding that Ms. Chambers did not make a sudden, impetuous stop; that Mr. Courtney may have grazed her gently on his own power before being struck by Graybiel's Grand Prix, or that he may have negligently stopped too close behind Ms. Chambers; and that Graybiel was not solely responsible because Courtney did not keep enough distance between himself and Ms. Chambers. Under the circumstances, we simply cannot say the jury was plainly wrong to interpret the conflicting testimony in the manner it did. We perceive no manifest error in the jury's allocation of fault. It will be affirmed.

General damages
By her second, third and sixth assignments of error Ms. Chambers contests the denial of general damages. She argues that it is illogical to award past medicals and lost wages but not to award damages for pain and suffering.
*370 This court has recently reiterated that when a jury awards special damages for medical expenses but then fails to award general damages, the jury has committed error of law. Sumrall v. Sumrall, 612 So.2d at 1015, and citations therein. For this reason the trial court was wrong to deny Ms. Chambers's motion for JNOV as to damages or for additur. Id.; Odendahl v. Wild, 418 So.2d at 37. This court may award damages, but the scope of appellate authority is limited to the trial court's range of reasonable discretion, given the record as a whole. Odendahl v. Wild, supra; Coco v. Winston Industries Inc., supra. We also take into account the jury's implicit finding that the accident caused only a portion of Ms. Chambers's many injuries. Parliman v. Kennelly, supra.
Ms. Chambers described her reaction to the first impact as "going forward and coming back," and to the second one by saying that her body went "forward." She testified that these impacts gave her immediate burning pain in her neck and a twisting of her foot. Mr. Courtney, however, testified that he was "pushed into" the Mustang with an impact that was "very minor." Mr. Graybiel and his passengers all described his contact with Courtney's Lincoln as a "minor tap" or "bump." Ms. Chambers was not even certain that the Mustang moved forward in the impacts. R.p. 572. Deputy Frake reported moderate damage to the Mustang, and Ms. Chambers's boyfriend testified that it would have cost about $900 to repair the bent rear isolators, slightly displaced bumper and slightly buckled roof. Both he and Ms. Chambers admitted they did not get the car fixed; Mr. Courtney and Mr. Graybiel testified that at the scene, they could not discern the damage. On this evidence, the jury was within its discretion to find that the impact to Ms. Chambers was minimal.
Nevertheless, the impact sent her to Willis-Knighton Hospital on the evening of the accident, and to seek treatment from her chiropractor. Ms. Chambers had an extensive prior history of aches and pains, including a prior diagnosis of fibrositis. This, in our view, made her more susceptible to injury in a relatively minor impact. The tortfeasor takes the victim as he finds her. Perniciaro v. Brinch, supra. When she saw Dr. Wojcik on July 18, Ms. Chambers had diminished range of motion and displayed spasms in her neck. R.p. 472-473. Dr. Wojcik diagnosed "cervical sprain strain injury of the neck" with "upper thoracic complaints as well, not necessarily injury, but complaints." Id. Dr. Wojcik testified that Dr. Smith, an orthopedist, also diagnosed musculoligamentous strain, although Dr. Smith's report is not included in the record. R.p. 478. Dr. Mead, an orthopedist who examined her for State Farm, also found that she sustained "initially a cervical strain." Ex. SF-2. Dr. Wojcik further testified that an injury of this sort should resolve in six to eight weeks. R.p. 485. In fact, he noted that roughly five weeks after the accident Ms. Chambers's neck and shoulder were "much better." R.p. 479.
The residual complaints, however, are more uncertain. The major problem is her extensive history of injuries, aches and pains, all of which are remarkably similar to her post accident complaints. We have already summarized most of her medical history in the factual background. Significantly, Bossier City orthopedist Dr. Brian had treated her for lower back pain in 1982, and Dr. McAlister had treated her for persistent soreness in the neck with headaches in May 1983; she was hospitalized for this for one week in late May 1983. Later that summer she also complained of pain in both legs, and Dr. Burda diagnosed her with fibrositis. A work-related injury in November 1987 led her to complain of lower back pain with pain radiating down the right hip and thigh; Dr. Wojcik was treating her for this until a few months before the instant accident. Unfortunately, Ms. Chambers did not provide much of this history to her lead expert witness, Dr. Williams, who was unfamiliar with most of it until it was presented to her at trial. After these revelations, Dr. Williams would not change her diagnosis of fibrositis, but stated, "I don't think we can say that the automobile accident caused it. I think there's reasonable doubt, at least in my mind[.]" R.p. 461. The jury was able to see that Ms. Chambers had withheld important medical information from Dr. Williams, who ultimately downgraded her opinion as a result; *371 this could well have demeaned the credibility of Ms. Chambers's (and her boyfriend's) testimony that her prior complaints were never so severe as they currently are.
Further, the severity of Ms. Chambers's current complaints was somewhat undermined by the expert evidence. After Dr. Wojcik found muscle spasms and decreased flexion in the first few weeks post accident, not one objective test ever substantiated any abnormality. For almost three years after the accident she continued to work at a job which, according to Dr. Williams, may have been responsible for her condition. R.p. 434. Dr. Williams also felt that Ms. Chambers had not adequately pursued her therapy exercises, even though Ms. Chambers took off six weeks of work to attend them. In hearing these facts, the jury could have concluded that Ms. Chambers's current complaints were not debilitating.
Finally, the alleged causation between Ms. Chambers's TMJ problems and the accident was tenuous. Dr. Hollembeak testified at first, "It certainly is within reason that that [the TMJ problem] could have happened in the accident." R.p. 505. He further admitted that the mechanical forces of the accident would need to be sufficient to produce an injury; that he would expect to see symptoms "shortly after" the trauma, not 10 months later; and that the medical community is not unanimous in holding that whiplash injuries can cause TMJ problems. R.pp. 519-521. He ultimately testified that Ms. Chambers's TMJ condition was "less likely" to have been caused by the accident. R.p. 527. Dr. Williams only "wondered if she was perhaps gritting her teeth" because of fibrositis, thus leading to the jaw pain. R.p. 407. On this evidence, the jury would not be plainly wrong to reject the claim that the TMJ condition resulted from the accident.
In light of the controverted evidence and the plaintiff's credibility problems, we find no manifest error in the jury's obvious conclusion that Ms. Chambers sustained no serious injury in the accident, or long-term effects that were appreciably worse than those she suffered before. Rosell v. Esco, supra. We will defer to the jury's finding and affirm this aspect of the judgment.
However, the jury was plainly wrong to deny general damages for short-term pain and suffering while awarding special damages for medical expenses and lost wages. Sumrall v. Sumrall, supra. The evidence clearly shows that Ms. Chambers sustained a minor soft-tissue injury, strain or sprain to her neck and shoulder region in the accident. Because of her prior condition of fibrositis, the trauma apparently affected her worse than the normal person. Perniciaro v. Brinch, supra. The quantum cases cited by State Farm in brief, such as Cormier v. Habetz, 542 So.2d 814 (La.App. 3d Cir.1989), and Aguillard v. Frank, 542 So.2d 834 (La. App. 3d Cir.1989), admittedly involve similar types of auto accidents but not similarly afflicted plaintiffs. The quantum cases cited by Ms. Chambers in brief, such as Hunt v. Board of Supervisors, 522 So.2d 1144 (La. App. 2d Cir.1988), and Rogers v. National Dealer Services Inc., 508 So.2d 1007 (La.App. 2d Cir.), writs denied 512 So.2d 1183, 513 So.2d 1211 (1987), are also inapposite because of the much more severe injuries therein. Zurich submits that an award of $7,500 would be appropriate. Given Ms. Chambers's prior condition, and the extent of the aggravation that she suffered, we believe that $10,000 in general damages is reasonable and within the factfinder's discretion. Judgment will be entered to that effect.

Special damages
By her fourth and fifth assignments Ms. Chambers contests the award of only $1,500 in medical expenses and the denial of lost earning capacity.
As an initial point, she urges the verdict form was incorrect for combining two elements, lost wages and lost earning capacity, into what appears to be one element of damage. However, the trial court has much discretion in determining how to obtain verdicts from a jury. Guillory v. Avondale Shipyards Inc., 448 So.2d 1281 (La.1984); Abrams v. Dinh, 471 So.2d 994 (La.App. 1st Cir.1985). Interrogatories for each element of damage would have been preferable, as "lump sum" verdicts potentially make judicial review more difficult. However, Ms. Chambers *372 has not enunciated how she was prejudiced by the instant form. By written objection she urged the form was confusing to the jury, but the jury charge carefully distinguished between lost past wages and lost earning capacity. R.pp. 779-780. Moreover, a lump sum award can be analyzed by asking whether the proven amount of damages is so significant in comparison to the total award as to indicate that the jury was plainly wrong not to award it. Campbell v. Chatelain, 286 So.2d 799, at fn. 3 (La.App. 4th Cir.1973). The verdict appears to be an award of $400 for lost past wages and a denial of lost earning capacity, and Ms. Chambers apparently concedes this in the phrasing of her fourth assignment.
Thus the question is whether the jury was plainly wrong to deny the claim for lost earning capacity. Ms. Chambers testified that she was terminated from Hardee's because of her job performance; she could not do all her duties, such as unloading the frozen food from the trucks, although in an earlier deposition she claimed there was nothing she could not do. R.pp. 564-565. She also complained that because of the pain from the accident, she could not get along with her managers (who were promoted after she left). Her former coworker, Shirley Smith, also testified that after the accident, the least little thing would "set her off." R.p. 597. Ms. Smith verified that Ms. Chambers seemed to be in pain, but most of what she described pertained to Ms. Chambers's wrist, which Dr. Williams found was not related to the accident, and to her legs and feet, which had apparently antedated the accident. Dr. Williams did not express an opinion on whether Ms. Chambers could work, and even declined to predict if Ms. Chambers's current complaints were likely to continue the rest of her life. R.p. 425. Dr. Wojcik, her treating chiropractor, testified there was "no reason" why she could not return to work; Dr. Mead, who examined her on a one-time basis, found no permanent disability. R.p. 481; Ex. SF-2. Before she was terminated from Hardee's (for reasons that admittedly included an inability to get along with assistant managers transferred from closed stores to hers) she was making more money than before the accident. This final point is by no means dispositive. Folse v. Fakouri, supra. However, when we review it together with the medical evidence that does not really support the claims of disability or impairment, we are constrained to hold the jury simply did not abuse its discretion in rejecting this portion of the claim. Aside from Ms. Chambers's own testimony, which was fraught with credibility problems, the evidence is too inconclusive to undermine the verdict as manifestly erroneous. It will be affirmed.
The fifth assignment, however, presents a case of clear error in light of the evidence and the jurisprudence of Sumrall v. Sumrall, supra. Ms. Chambers submitted medical expenses of $10,814.23. The jury awarded $1,500, which State Farm submits roughly corresponds to the treatment she received until Dr. Wojcik noted maximum recovery. However, the tortfeasor is required to pay for overtreatment or even unnecessary medical treatment unless the plaintiff incurred these expenses in bad faith. Sumrall v. Sumrall, supra, and citations therein. While the error is apparent and must be corrected, the plaintiff's recovery must be confined to expenses that were related to the tort. American Motorist Ins. Co. v. American Rent-All, supra. On the instant record, we simply cannot say that all of Ms. Chambers's expenses were reasonably related to the accident. Dr. Williams clearly testified that the carpal tunnel syndrome was not, and Dr. Hollembeak was equivocal about the source of the TMJ problem; these charges must be excluded. Dr. Williams saw Ms. Chambers on referral from Dr. Wojcik, after the latter declared that he could make no more progress with her. Notably, Dr. Williams diagnosed the same condition, fibrositis, that Ms. Chambers had before the accident, and she was never able to obtain any improvement. Ms. Chambers was neither forthcoming in relating her medical history to Dr. Williams nor cooperative in pursuing the therapy that Dr. Williams ordered. On this record we cannot say that Ms. Chambers sought these items of treatment in good faith, and they will be excluded. Under the principles of Sumrall, supra, and the facts just outlined, judgment will be entered for *373 Ms. Chambers's initial treatment at Willis Knighton Hospital, her visits to Dr. Wojcik and Dr. Smith, and her pharmacy bills, for a total of $2,455.98 (instead of the jury's award of $1,500).
The judgment will be amended accordingly. The medical expenses are, of course, reduced to Mr. Courtney's 20% share of the fault, or $491.20. La.C.C. art. 2324 B. They are also subject to State Farm's subrogation claim for Med-Pay of $5,000. State Farm settled with Graybiel (and his insurer), who was found to be 80% at fault; thus State Farm may recover up to $1,000, including all of this award, from Courtney and Zurich. La.C.C. art 1803. State Farm's recovery is also subject to credit for any amount previously paid under the trial court's judgment.

Conclusion and decree
For the reasons expressed, the judgment is affirmed with respect to the allocation of fault and the phraseology of the verdict form. It is also affirmed with respect to the award for lost wages and earning capacity. The judgment is amended, however, to correct the legal errors of denying general damages and the proven medical expenses. Judgment is recast as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein for Sandra T. Chambers against Thomas Courtney Jr. and Zurich Insurance Company for twenty percent (20%) of the general damages of Sandra T. Chambers in the amount of Ten Thousand and .00/1.00 ($10,000.00) dollars, together with legal interest thereon from date of judicial demand.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein for State Farm Mutual Automobile Insurance Company against Thomas Courtney Jr. and Zurich Insurance Company in the amount of twenty percent (20%) of the medical expenses of Sandra T. Chambers in the amount of Two Thousand, Four Hundred Fifty-Five dollars and .98/1.00 ($2,455.98) dollars, subject to credit for any amount previously paid under the trial court judgment.
The judgment is otherwise affirmed. Costs of appeal are assessed one-half to State Farm Mutual Automobile Insurance Company and one-half to Thomas Courtney Jr. and Zurich Insurance Company.
AMENDED AND AFFIRMED.