658 So.2d 288 (1995)
Sherri Denice TAYLOR and Charles A. Taylor, Plaintiffs-Appellants,
v.
AMERICAN LAUNDRY MACHINERY, INC., et al., Defendants-Appellees.
No. 27121-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1995.
*290 James M. Johnson, Campbell, Campbell & Johnson, Minden, for appellants Sherie Denice Taylor and Charles A. Taylor.
Edwin Byrd, III, Blanchard, Walker, O'Quin & Roberts, Shreveport, for intervenor/appellant Travelers Ins. Co.
David F. Butterfield, Mayer, Smith & Roberts, Shreveport, for appellees American Laundry Machinery, Inc., et al.
Robert G. Pugh, Pugh, Pugh & Pugh, Shreveport, for appellees David L. Sheppard, M.D., et al.
Before BROWN and WILLIAMS, JJ., and EDWARDS, J. Pro Tem.
WILLIAMS, Judge.
The plaintiffs, Sherri Denice Taylor and Charles A. Taylor, appeal the trial court's dismissal of their products liability and medical malpractice claims. After a trial, the jury unanimously found that the plaintiffs failed to prove fault on the part of the product manufacturer and failed to prove that the medical treatment provided by the medical malpractice defendant fell below the applicable standard of care. We affirm.

BACKGROUND
Sherri Denice Taylor alleges that on May 1, 1986, while she was an employee of Morton-Thiokol Corporation ("Thiokol") at the Louisiana Army Ammunition Plant in Webster Parish, she suffered injuries to her arms and hands while cleaning an industrial clothes dryer. She also contends that the plant physician's treatment of her injuries constituted medical malpractice. As a consequence, she maintains, she developed a staphylococcus ("staph") infection which causes recurrent outbreaks of skin lesions over various parts of her body, resulting in numerous hospitalizations and various other damages.
Taylor and her husband, Charles A. Taylor, brought a products liability claim against the parties they believed to be responsible for the manufacture of the clothes dryer, American Laundry Machinery, Inc., McGraw-Edison Company and Cooper Industries. Taylor filed a complaint against the plant physician, Dr. David L. Shepard, pursuant to the Louisiana Medical Malpractice Act. In addition, Dr. Shepard, Lammico Insurance Company and The Patient's Compensation Fund were added to the lawsuit as defendants in a medical malpractice claim. Travelers Insurance Company, the worker's compensation insurer for Thiokol, intervened seeking recovery of expenses it had paid for Taylor.
After a lengthy trial, the jury made two findings which terminated their inquiry: 1) the manufacturer of the clothes dryer was without fault and, 2) Dr. Shepard's treatment of Taylor did not violate the applicable standard of care. On appeal, the plaintiffs allege that these findings are contrary to the law and the evidence presented. They further contend that the trial court erred in denying their motions for new trial and judgment notwithstanding the verdict ("JNOV").

DISCUSSION

STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong *291 standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.
In order to reverse a factfinder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: 1) an appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the factfinder is clearly wrong (manifestly erroneous). Theriot v. Lasseigne, 93-2661 (La. 07/05/94), 640 So.2d 1305.
The denial of a motion for new trial is discretionary with the trial court and should not be reversed unless there has been an abuse of that discretion. Chambers v. Graybiel, 25,840 (La.App.2d Cir. 06/22/94), 639 So.2d 361; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App.2d Cir. 1991).
A judgment notwithstanding the verdict ("JNOV") is a procedural device by which a trial judge may correct a legally erroneous verdict. Hardin v. Munchies Food Store, 521 So.2d 1200 (La.App.2d Cir. 1988), writ denied, 523 So.2d 1321 (La.1988). The standard for granting a motion for JNOV has developed jurisprudentially.
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991) (citations omitted).

PRODUCTS LIABILITY CLAIM[1]
The applicable law in this products liability case is that set out in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986).[2] To recover from a manufacturer on a products liability claim, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Halphen, supra. In brief, a product may be unreasonably dangerous because of its design if 1) a reasonable person would conclude that the danger-in-fact outweighs the utility of the product; 2) alternative products were available to serve the same needs or desires with less risk of harm; or, 3) there was a feasible way to design the product with less harmful consequences. See Halphen, supra, for a more comprehensive discussion of the design defect theory of products liability. Also, a product may be unreasonably dangerous if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen, supra. A manufacturer's duty to warn generally includes a duty to *292 provide safe use instructions. However, the duty does not require warnings or instructions concerning dangers that are or should be obvious to the ordinary user. Hines v. Remington Arms Co., Inc., 94-0455 (La. 12/08/94), 648 So.2d 331. Whether a product is unreasonably dangerous, and thereby defective, is a question of fact to be made by the factfinder. Hines, supra. In the instant case, the plaintiffs allege that the clothes dryer was unreasonably dangerous due to its design and due to the failure of the manufacturer to adequately warn users of the risk of harm encountered by Taylor.

Defective Design
Sherri Taylor indicated that as a laundry employee at the Thiokol plant, part of her job was to clean a large clothes dryer, three to five times per week. Pneumatic lifts were used to elevate and tilt the front portion of the machine backwards. Taylor would then crawl underneath the machine and reach up into a dark cavity to remove lint from the vanes of the dryer's exhaust blower. Taylor testified that this was the manner in which her supervisor, James Flynn, had instructed her to clean the dryer and the manner in which she was cleaning it on May 1, 1986, when she was injured.
According to Taylor, while she was cleaning the exhaust blower vanes, she got slivers of glass and wood in her arms and hands. She asserts that the slivers were imbedded in the lint she was cleaning from the vanes. Taylor testified that she immediately reported the injury to Flynn and was taken by plant transportation to the plant medical facility where she was seen by Dr. Shepard. However, the medical pass completed by Flynn indicates that the injury occurred on April 29, 1986. Flynn testified that Taylor told him that was the date she was injured. A fellow laundry employee, Stacy Greenard, corroborated Taylor's testimony in part, stating that there had been nothing wrong with Taylor's arms and hands prior to her going underneath the dryer to clean, but when Taylor came out from under the dryer, Taylor showed her "little punctures" on her hands and arms.
The defendants introduced evidence that Taylor had previously stated, under oath, in her response to interrogatories, that on May 1, 1986, she sustained wooden splinters in her forearms, hands and fingers from the rough and unrefined sides of a wooden crate used in the laundry for the temporary storage of wet clothes. In addition, the defendants' introduced into evidence a file memorandum of Taylor's previous attorney which contained statements by Taylor that on the date in question she had found brown glass in the clothing and picked out all that she could. The testimony of various witnesses pointed to some inconsistencies in Taylor's accounts of where she was injured (arm(s), hand(s), and/or fingers), what foreign object entered her body (wooden, glass, and/or metal splinters), and the possible source of the injury (glass in clothing, wooden crate, lint in dryer).[3]
Evidence was presented that there was a plaque on the dryer referring the operator to the instruction manual. However, Taylor indicated that she had never seen or read the instruction manual for the dryer. Flynn testified that a copy of the manual was available in laundry. Taylor testified that because of her fear that the dryer may fall on her, she would have avoided going under the dryer to clean had she known there was another means to do so. She further testified that it was only in the course of litigation that she *293 became aware that the front panel of the dryer could be removed to do the cleaning. Taylor acknowledged, however, that a similar large dryer in the laundry was cleaned by removing a panel because that machine had a "skirt" around it which prevented access from underneath. Taylor's co-employee, Greenard, testified that it was easy to remove the metal panel on the skirted machine and that she felt the cleaning procedure on that machine was "safe."
The plaintiffs contend that the design of the dryer was unreasonably dangerous in that the cleaning method recommended by the manufacturer was difficult and encouraged the kind of misuse which caused Taylor's injuries. Dileep Sule, an expert in mechanical and industrial engineering, testifying for the plaintiffs, indicated that the manufacturer's recommended cleaning method, which involved removing a large metal panel attached to the front of the dryer with six thumb screws, was not convenient and would be awkward for a person of Taylor's size. However, he further testified that he "did not look at the panel itself" and that when he inspected the dryer someone else removed the panel for him. In addition, he assumed the panel was made of steel and could only estimate its weight. Dr. Sule indicated that handles and hinges on the removable panel would permit easier removal.
The instruction manual for the dryer and various photographic exhibits introduced into evidence clearly illustrate the configuration of the dryer, the access to the exhaust blower provided by the manufacturer, and the contrary means by which the laundry employees accessed the exhaust blower. Dr. Terrance Willis, an expert in mechanical engineering with a specialty in safety and design, testified for the products liability defendants. Dr. Willis explained how the exhaust blower is accessed for cleaning according to the manufacturer's instructions. In brief, the operator is to remove the metal panel by removing six thumb screws. The fifteen-pound panel has a metal bumper by which it can be gripped and lifted away from the dryer. Once the panel is removed, a trap door to the exhaust blower is opened by turning two handles. Through the trap door, the operator may remove lint encrusted on the vanes of the exhaust blower and any objects which have been trapped at the bottom of the exhaust blower housing.
Dr. Willis indicated that the removable panel is a guard, a safety feature, for the protection of the operator. He opined that to allow the operator too ready access to the heated and moving parts of the dryer, such as by use of hinges as Dr. Sule recommended, would be dangerous. Dr. Sule, when confronted regarding the possibility of increased risk of harm if the operator had easy access to the exhaust blower, responded that a lock could be put on the hinged door. Dr. Willis testified that the dryer was designed to be cleaned safely and is not defective in this respect.
After a review of the record in its entirety, we conclude that the jury could have reasonably concluded that the manufacturer provided a convenient and safe means for cleaning the exhaust blower vanes. A reasonable factual basis exists for such a finding. We cannot say that the jury, which had the opportunity to hear, observe, and assess the credibility of the witnesses, including opposing expert witnesses, was manifestly erroneous in its determination that the dryer was not unreasonably dangerous in design.

Inadequate Warning
The plaintiffs also argue that the manufacturer failed to adequately warn the operator about the risks of injury posed by foreign matter in the dryer. Although a manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product, this duty does not encompass dangers that are within the knowledge of or are obvious to the ordinary user.
Taylor testified that she knew that potentially dangerous objects had been found under the tumbler of the dryer. She indicated that she knew that there may be objects in the uniforms being laundered. Taylor specifically testified that she had found a nail underneath the dryer and glass in clothing being laundered.
Dr. Sule opined that the instruction manual was inadequate in that it did not provide *294 instructions for safely cleaning the vanes of the exhaust blower. In his report, Dr. Sule identified operational problems and recommended that the operator use gloves, a portable light source, and a vacuum cleaner when cleaning the exhaust blower vanes. According to Dr. Sule, there was an 80 percent probability that the incident would not have occurred with the use of gloves. In contrast to Dr. Sule and Taylor, other witnesses testified that the lighting was sufficient for cleaning the dryer. In the course of trial, Dr. Sule acknowledged that a vacuum cleaner alone would not be effective in cleaning the exhaust blower vanes because the lint was encrusted on the vanes.
Dr. Willis described the instruction manual as "clear and exceptionally safe." We note that the manual provides some instructions on cleaning the exhaust blower vanes and removing foreign objects from the exhaust blower trap. It states, in part, "Small foreign objects (washers, metal cuttings, nuts, rivets, etc.) collect in the exhaust blower trap." Dr. Willis testified that it is the operator's decision whether to use gloves in cleaning the dryer and common sense would dictate that an operator who was aware of the potential for sharp or dangerous objects in the laundry would choose to wear gloves.
After a review of the record, we conclude that the jury could have reasonably believed that the risk of harm from foreign objects in the dryer was obvious to Taylor, an ordinary user, and thus, the manufacturer had no duty to warn of this danger. Even if the jury determined that the manufacturer had a duty to warn of the risk, there is sufficient evidence in the record for the jury to have reasonably concluded that the warning, including safe use instructions, was adequate. We cannot say that the jury, which was in a position to assess the credibility of the witnesses, was clearly wrong in its determination that the clothes dryer was not unreasonably dangerous due to the failure of the manufacturer to provide adequate warning of the danger which Taylor encountered.

Denial of Motions for JNOV and New Trial
The jury found no fault on the part of the manufacturer of the clothes dryer. The minutes of the court reflect that on May 31, 1994, argument was heard and motions for JNOV and new trial were denied.[4] A motion for JNOV is properly granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach a different conclusion. After reviewing the record, we conclude that there is evidence opposed to the motion which is of such quality and weight that reasonable, fair-minded individuals might reach different conclusions regarding the fault of the products liability defendants. Accordingly, the trial court did not err in denying the motion for JNOV as to the products liability claim.
As indicated above, the jury's verdict as to the products liability defendants is supported by the record. The verdict is not clearly contrary to the evidence. Furthermore, in our review we find no indication that the verdict is contrary to law or that a new trial is otherwise warranted. Accordingly, we conclude that the trial court did not abuse its discretion in denying the plaintiffs' motion for new trial as to the products liability claim.

MEDICAL MALPRACTICE CLAIM
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected in that medical specialty and then establish a causal relationship between the alleged negligent acts and the injury. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Gibson, supra.
The statutory provisions which provide for a panel to review medical malpractice claims, state in pertinent part:
Any report of the expert opinion reached by the medical review panel shall be admissible *295 as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness.
LSA-R.S. 40:1299.47(H) (emphasis added).
Thus, a jury is entitled to make its own determination of whether the care provided by a medical malpractice defendant was substandard.
In the instant case, the plaintiffs allege that Dr. Shepard failed to provide adequate care for Taylor when she saw him regarding the injuries to her hands and arms. Taylor and Dr. Shepard provided conflicting accounts of what transpired when Taylor sought treatment at the Thiokol plant medical facility on May 1, 1986. Taylor testified that Dr. Shepard, using a needle and tweezers, removed a number of foreign objects from her arms and hands during a 10 to 20-minute period. She further testified that the doctor gave her a week's supply of erythromycin and told her that "it would be okay." According to Taylor, Dr. Shepard gave her no further instructions and no work restrictions. She indicated that she took the erythromycin as directed and continued to work in the laundry; however, her infection became worse over the next week.
Dr. Shepard testified that when Taylor came to him complaining of glass splinters in her hands, he saw four or five pinhead-sized, raised, red spots on the back of each of her hands. He testified that he found no foreign objects or puncture wounds. According to Dr. Shepard, he examined the red spots with a magnifying glass and they appeared to him to be folliculitis, a condition resulting when bacteria enters the skin through hair follicles. Dr. Shepard testified that he gave Taylor a supply of erythromycin, an antibiotic, and told her that if she had any problems he wanted to see her. In addition, according to Dr. Shepard, he told Taylor his emergency room work schedule for the weekend in case she needed him. Dr. Shepard indicated that because Taylor had no open wounds, he properly allowed her to return to the laundry to work. Although the record of Taylor's May 1, 1986 visit to Dr. Shepard indicates that glass and metal fragments were removed from her hands and arms, the doctor testified that he did not make this entry. In addition, Dr. Shepard testified that he did not make the notation "probable spreading through the bloodstream" on the record of Taylor's May 8, 1986 return visit. He indicated that the entry, which was probably made by the nurse, was erroneous and that Taylor did not have a systemic staphylococcal infection.
Dr. George McCormick, testifying for the plaintiffs, opined that Dr. Shepard's care of Taylor fell below the standard of care when he administered erythromycin without having cultured Taylor's infection. He further testified that erythromycin was not the drug of choice for the skin infection. He acknowledged, however, that if Taylor had told Dr. Shepard that she was allergic to penicillin, as Dr. Shepard testified, then erythromycin would have been a proper drug to try. Dr. McCormick further testified that Dr. Shepard's treatment fell below the ordinary standard of care when he returned Taylor to work in the hot, humid laundry environment, especially without having bandaged the affected area. Dr. McCormick was also critical of Dr. Shepard's apparent lack of follow-up instructions. In addition, Dr. McCormick indicated that if the medical records were accurate and Dr. Shepard thought Taylor's infection was spreading via her bloodstream, Dr. Shepard should have hospitalized her immediately.
The medical panel which evaluated Taylor's claim against Dr. Shepard concluded that he failed to meet the applicable standard of care in his failure to document instructions to Taylor. However, the medical review panel found that Dr. Shepard met the appropriate standard of care with respect to the actual treatment rendered on May 1, 1986. The panel was unable to determine whether Dr. Shepard's conduct was a contributing factor in Taylor's subsequent extensive medical problems.
Dr. Alan J. Borne, a member of the medical review panel, opined that the infected area did not need to be cultured prior to administering erythromycin. He further testified that erythromycin was an appropriate *296 choice of medication, particularly for a patient allergic to penicillin. Dr. Borne also opined that if the patient did not have open wounds, it would be within the standard of care for the patient to return to work in the plant.
Dr. James R. Bergeron, a dermatologist who subsequently treated Taylor, testified that he, too, had recommended erythromycin for her skin condition. He further testified that a physician would not necessarily culture a skin condition such as Taylor's on the first visit. Dr. Bergeron stated that, given the description of Taylor's condition on May 1, 1986, he saw no medical reason why she should not have returned to work in the laundry. In addition, he testified that to his knowledge, Taylor has never had a blood borne infection.
Dr. Raymond A. Coghlan, an infectious disease specialist who treated Taylor, testified that he would not culture a minor skin rash on a patient's first visit. He also indicated that, depending on the appearance of the rash, he may not even prescribe medication at that point, but would monitor the condition. Likewise, Dr. William Lewis Norwood, a surgeon Taylor consulted on May 8, 1986, testified that he did not perform a culture on that date because it was not necessary. Although Dr. Norwood did change Taylor's antibiotic, he did not recommend a change in work assignment at that time.
Dr. Eustace Louis Edwards, III, a specialist in internal medicine, testified for the defense. Dr. Edwards opined, in essence, that whether one believed Taylor's or Dr. Shepard's account of the care provided by Dr. Shepard, there is nothing that Dr. Shepard did or failed to do that caused or worsened Taylor's skin condition.
Having reviewed the voluminous medical testimony in the instant case, we find that, assuming the jury believed Dr. Shepard's account of how Taylor presented for treatment and how he treated her, most of the medical evidence supports the jury's finding that Dr. Shepard's treatment of Taylor was adequate. We give great deference to the factfinder's determinations regarding the credibility of witnesses. We cannot say that the jury was clearly wrong or manifestly erroneous in its finding that Dr. Shepard's treatment of Taylor was not below the standard of care.

Denial of Motions for JNOV and New Trial
The jury found that the care provided by Dr. Shepard did not violate the applicable standard of care. The trial court subsequently denied the plaintiffs' motions for JNOV and new trial. The plaintiffs' motion for JNOV properly could have been granted only if the evidence pointed so strongly in favor of the plaintiffs that reasonable persons could not have reached a different conclusion. Considering that the record includes evidence opposed to the motion which is of such weight and quality that reasonable, fair-minded individuals might reach a different conclusion regarding whether Dr. Shepard's treatment met the applicable standard of care, the trial court correctly denied the motion for JNOV.
The jury's verdict regarding the medical malpractice claim is supported by the record. The verdict is not clearly contrary to the evidence. On review, we find no indication that the verdict is contrary to law or that a new trial is otherwise warranted. Accordingly, the trial court did not abuse its discretion in denying the motion for new trial as to the medical malpractice claim.

CONCLUSION
For the foregoing reasons, the verdict of the jury in favor of the products liability defendants and in favor of the medical malpractice defendants is affirmed. In addition, the trial court's denial of the plaintiffs' motions for judgment notwithstanding the verdict and new trial are upheld. Costs of appeal are assessed against the plaintiffs, Sherri D. Taylor and Charles A. Taylor.
AFFIRMED.
NOTES
[1] The products liability defendants argue that the plaintiffs' suit had prescribed when the proper party defendant was named. However, since the jury found no fault on the part of any of the products liability defendants, we will not address this issue and will fully consider the merits of the plaintiffs' claim.
[2] Taylor's injury occurred in 1986, before the Louisiana Products Liability Act (LSA-R.S. 9:2800.51 et seq.) became effective on September 1, 1988. The Act affects substantive rights and, accordingly, has been held not to apply retroactively. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991).
[3] Dr. Robert C. Hernandez, a member of the medical review panel which reviewed Taylor's complaint against Dr. Shepard, testified that in the natural evolution of infection, a secondary infection takes some time to develop and a cut will become infected about four days after inflicted. He opined that it is "medically unlikely" that Taylor would have presented to Dr. Shepard with pinpoints of infection approximately an hour after having suffered puncture wounds to the skin. He further opined that the pinpoints of infection observed by Dr. Shepard on May 1, 1986, would be more consistent with an injury having occurred on April 29, 1986. Hypothetically given that on April 29, 1986, Taylor got splinters in her hand from clothing in the dryer, from a wooden crate in the laundry, and from lint she was cleaning from the dryer, Dr. Hernandez testified that any of the three sources could have resulted in infection and that he could not state more probably than not which source caused the infection observed by Dr. Shepard.
[4] The record does not include a transcript of the argument. The record does include the two motions filed by the plaintiffs. The motion for new trial urges that the verdict is clearly contrary to the law and the evidence. It states further that additional grounds for granting a new trial appear in the brief submitted therewith. However, we find no such brief in the record. Accordingly, we make our determination based on the record before us.