691 So.2d 876 (1997)
Tony F. CAPPO, et al., Plaintiff-Appellant,
v.
SAVAGE INDUSTRIES, INC., et al., Defendant-Appellee.
No. 29432-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 1997.
Rehearing Denied May 1, 1997.
*877 Anthony J. Bruscato, Monroe, for Plaintiff-Appellant.
Theus, Grisham, Davis & Leigh by David H. Nelson, Monroe, for Defendant-Appellee.
Before WILLIAMS, CARAWAY and PEATROSS, JJ.
WILLIAMS, Judge.
Plaintiff, Tony Cappo, appeals a trial court judgment rendered in favor of the defendant, Savage Industries, Incorporated ("Savage"), rejecting plaintiff's wrongful death claim for the shooting death of his son, Robert Cappo. For the reasons assigned below, we affirm the trial court's judgment.

FACTS
On the afternoon of September 20, 1982, fourteen-year-old Timothy Cappo, fourteen-year-old Brad Ray, and sixteen-year-old Robert Cappo were attempting to fix a radio at the home of the Cappos' mother, Billie Tolbird. The boys were in Timothy and Robert Cappo's bedroom where Timothy kept an unloaded twelve-gauge bolt action shotgun manufactured by Savage Industries. At some point during the afternoon, Brad picked up the gun, loaded it with a shell and pointed it at Robert. The gun's safety was off. According to Brad's deposition testimony[1] and Timothy's trial testimony, Brad was only playing and did not intend to shoot Robert. No disagreement or fight preceded Brad's actions.
Robert did not want the loaded gun pointed at him, and he emphatically communicated this to Brad. Despite Robert's disapproval, Brad continued to point the gun at Robert. Eventually, Robert took an axe handle and started swinging in Brad's direction in an effort to make Brad stop pointing the gun at him. After several swings, the axe handle contacted the barrel of the gun. The gun *878 discharged, killing Robert instantly. According to both Brad and Timothy, Brad never touched the trigger, but kept his hand cupped around the metal guard in front of the trigger.
The Ouachita Parish Sheriff's Office investigated the incident. In addition to taking statements from Timothy and Brad, the officers tested the accident gun by striking the barrel while the safety was off to see if the gun would discharge. According to Pat Willis, an investigator with the sheriff's office, the gun would discharge more often than not when the barrel was struck with moderate force. Based on its investigation, the sheriff's office ruled the shooting an accident.
Subsequently, Robert's parents, Tony Cappo and Billie Tolbird, filed suit against Savage, the manufacturer of the accident gun. At some time later, Benjamin Brown, a former owner of the gun was added as a defendant.[2]
Several expert and lay witnesses testified at trial or by deposition. Justin Jones testified regarding the history of the accident gun. Jones testified that his father gave him the used gun when he was a teenager in the early nineteen-sixties and he kept the gun for one hunting season or approximately one year. According to Jones, when he owned the gun, it was a sound, safe firearm and he had no problems with it. He further testified that he had never attempted any type of repairs to the gun but only took the stock off and bolt out to clean those pieces. Jones never took the gun to a gunsmith to have it repaired or maintained. After keeping the gun for one year, Jones traded it to Jerry Bass.
Bass told a different story about the condition of the gun he obtained from Jones. Bass testified at trial that the accident gun had a "hair trigger" when he received it from Jones. Bass stated that Jones did not tell him about the trigger. However, during his deposition, Bass stated that Jones told him about the trigger. Bass also testified that the safety was unstable when he received the gun from Jones. Regarding repairs to the gun, Bass testified that he never did anything to the gun other than clean it with oil, and he never took it to a gunsmith for repair. Bass further stated that he gave the gun to Charlie Brown, his foster son, when Charlie was about eleven or twelve years old.
Charlie Brown did not testify. However, his brother, Benjamin Brown, testified that he borrowed the accident gun from Charlie, and the gun he received had serial numbers. Plaintiff's counsel noted that according to Savage, the Model 18 had never been assigned serial numbers. Benjamin did not believe the accident gun was the same gun that had been in his possession, because Charlie's gun had been well taken care of. He also testified that the accident gun did not have the same screws as Charlie's gun. He further noted that the clip was missing from the accident gun, whereas Charlie's gun had a clip held together with duct tape. Additionally, Benjamin stated the stock on Charlie's gun had a yellow rubber pad on it, whereas the stock on the accident gun had no pad.
When responding to whether Charlie's gun worked properly, Benjamin testified at trial that he did not know the gun was unsafe when he borrowed it. However, during his deposition, Brown testified that he had always known Charlie's gun would discharge without the trigger being pulled and the condition of the gun worsened while it was in his possession. He also testified that the gun would fire even with the safety properly engaged.
According to Benjamin, he disassembled the trigger guard and bolt selector and cleaned the firing pin with a finger nail file. Benjamin testified that he did not alter the trigger or sear. During his deposition, however, Benjamin stated that he used a file and sandpaper to make flat surfaces on the trigger and sear notches. He further testified that his brother, Charlie, had told him (Benjamin) that he attempted to work on the gun. During the trial, Benjamin testified that Charlie had told him (Benjamin) that he altered the trigger and sear, but during his *879 deposition, Benjamin testified that he did not know what type work Charlie may have done to the gun.
Although there was some discrepancy at trial as to how the Cappo boys came to be in possession of the accident gun, it is undisputed that Benjamin Brown possessed the gun immediately before the Cappo boys obtained possession of it.
The trial court also heard the testimony of several gun experts as to the design of the gun and the condition of the gun at the time of the accident. After reviewing the testimony and exhibits filed, the trial court rendered judgment in favor of Savage and against the plaintiff. In his reasons for judgment, the trial judge made several findings: (1) the plaintiff did not prove by a preponderance of the evidence that it was more likely that the accident gun fired due to being struck than due to Brad Ray's pulling of the trigger; (2) the plaintiff did not prove by a preponderance of the evidence that the trigger-sear mechanism of the accident gun was defectively designed, or that its design is a defect that outweighs its utility; and, (3) the plaintiff did not prove a defect in assembly of the accident gun by a preponderance of the evidence. Plaintiff appeals.

DISCUSSION
Although this case was not tried until 1996, the accident giving rise to the cause of action occurred in 1982. Thus, the law of products liability as it existed in 1982 is applicable to this case. See Taylor v. American Laundry Machinery, Inc., 27,121 (La.App.2d Cir. 6/23/95), 658 So.2d 288; writ denied, 95-1877 (La. 11/3/95), 661 So.2d 1385.
To prevail in a products liability case, the plaintiff must first prove that his harm resulted from the condition of the product at issue, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986). There are several classes of unreasonably dangerous products used to describe the theories under which a plaintiff can recover. Additionally, products which are "unreasonably dangerous per se" are a separate class of products. Liability for products in this category can be imposed solely based on the product's intrinsic characteristics. Halphen v. Johns-Manville Sales Corporation, supra.
A product is unreasonably dangerous per se if a reasonable person would conclude that the danger in fact of the product, whether foreseeable or not, outweighs the utility of the product. Hunt v. City Stores, Incorporated, 387 So.2d 585 (La. 1980); Halphen v. Johns-Manville Sales Corporation, supra. If a plaintiff proves that the product is unreasonably dangerous per se, it is not material that the case could have been tried under another theory of liability. Halphen v. Johns-Manville Sales Corporation, supra.
To recover under the theory that a product is unreasonably dangerous in construction or composition, a plaintiff must prove that the product contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be. The plaintiff does not have to prove negligence by the manufacturer. Halphen v. Johns-Manville Sales Corporation, supra.
A product may also be unreasonably dangerous because of its design. To recover under this theory, the plaintiff must prove: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product; or, (2) although a balancing test leads the trier of fact to conclude that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. Halphen v. Johns-Manville Sales Corporation, supra. Regarding the failure to use alternative products or designs, the standard of skill and care is that of an expert, including the duty to test, inspect, research and experiment commensurate with the danger. Thus, evidence as to whether the manufacturer, *880 held to the standard and skill of an expert, could know of and feasibly avoid the danger is admissible under a theory of recovery based on alleged alternative designs or alternative products. Halphen v. Johns-Manville Sales Corporation, supra.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless the finding is clearly wrong. Stobart v. State of Louisiana, Through the Department of Transportation and Development, 617 So.2d 880 (La.1993); Thomas v. Bryant, 25,855 (La.App.2d Cir. 6/22/94), 639 So.2d 378; Luman v. Highlands Insurance Company, 25,445 (La.App.2d Cir. 2/23/94), 632 So.2d 910. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State of Louisiana, Through the Department of Transportation and Development, supra; Thomas v. Bryant, supra.
Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of the trier of fact. Credibility determinations are the function and prerogative of the trial court. Stobart v. State of Louisiana, Through the Department of Transportation and Development, supra; Thomas v. Bryant, supra.
In the present case, plaintiff first assigns as error the trial court's failure to find that plaintiff proved by a preponderance of the evidence that the Savage Model 18 shotgun was defective in design. The plaintiff argues that the unbalanced trigger-sear mechanism design of the gun causes the Model 18 to discharge when it receives a blow to the barrel or is dropped.
Our initial inquiry is whether plaintiff has met the basic burden of proof under products liability law: (1) that his harm resulted from the condition of the product at issue; (2) that the condition made the product unreasonably dangerous to normal use; and, (3) that the condition existed at the time the product left the manufacturer's control. Halphen v. Johns-Manville Sales Corporation, supra. We find that we cannot reach an analysis of whether the accident gun was unreasonably dangerous per se (the first question under the defective design analysis) because according to the testimony presented at trial, at the time of the accident, the parts of the accident gun did not meet Savage's design specifications. Further, the testimony indicates that the accident gun was in a different condition at the time of the accident than it was when it left the manufacturer's control.
Experts for both plaintiff and defendant testified that the parts of the accident gun, albeit for different reasons, were excessively worn, and that the parts were no longer shaped as they were in the design drawings for the gun. Further, the testimony of Justin Jones, who came into possession of the accident gun in the early sixties and who is the earliest owner to whom the gun can be traced, indicates there was nothing dangerous about the gun when it left the manufacturer's control.[3] Jones received the gun used, owned it for approximately one year, and then transferred it to Jerry Bass. According to Jones, the accident gun was a safe firearm the entire time he possessed it, and was in good condition when he transferred it to Bass. Jerry Bass' testimony contradicts Jones' testimony, since according to Bass, the accident gun had a hair trigger when he received it from Jones. However, Jones testified that Bass did not keep his weapons in good repair, and that Bass never complained to him about the gun. The trial court obviously chose to credit Jones' testimony over Bass' testimony, and we find no indication that this choice was clearly wrong. For these reasons, we find no error in the trial court's conclusion that plaintiff failed to prove the gun was unreasonably dangerous in design.
We now turn to plaintiff's second assignment of error, i.e., that the trial court committed manifest error by failing to find that *881 the accident gun was unreasonably dangerous in construction.
As previously stated, the plaintiff must show that the condition of which he complains existed when the product in question left the manufacturer's control before he can be allowed to prove the manufacturer's liability under any theory. Halphen v. Johns-Manville Sales Corporation, supra. In the present case, plaintiff argues that the case hardening of the trigger and sear of the accident gun were ground away at the factory, before shipping, thus causing those parts to wear excessively. If the gun's safety was off, the excessive wear caused the accident gun to discharge from a blow without the trigger being pulled. Thus, plaintiff argues that the accident gun was shipped from the factory with a condition that made the gun more dangerous than it was designed to be. We find ample evidence in the record to support the trial court's conclusion that it was just as likely that alterations allowing excessive wear were performed after the gun left the factory, as it was that alterations to the gun were performed at the factory. Thus, we find the trial court did not err in failing to find a defect in the construction of the accident gun.
In support of his contention that the alterations to the accident gun occurred at the factory, the plaintiff offered the testimony of his experts, Liman Martin and Dr. William Jordan[4], that of several owners of the gun, the testimony of Otis England, a former Savage employee, and the testimony of Marvin Williamson, a gunsmith who had worked on Savage guns. Liman Martin testified that he found similar grind marks on the triggersear engagement point on the accident gun, a gun owned by Dan Street, and a Model 58 comparison, and that in his opinion, the marks on all the guns were made by a handheld grinder or machine grinder at the factory. However, on cross-examination, Martin admitted that he was only familiar with gun factory practices because he had toured gun factories. Thus, the court did not qualify Martin as an expert in grinding or fitting practices in gun factories. Nor did Martin testify that for some other reason, he was personally familiar with hand-fitting and grinding practices at Savage. Although Dan Street and his father testified that they had never done any grinding or any other type of alterations to Street's gun, Dan Street testified that his brothers may have used his gun. However, Street could not testify from personal knowledge as to whether his brothers had done anything to the gun other than clean it while it was in their possession.
Regarding the Model 58 twenty-gauge comparison gun, Martin was able to testify that the parts of the gun were unworn. However, he provided no information regarding the prior history of the gun. Thus, there was no information about the gun's previous owners or whether those owners had made any alterations to the gun. Based on the testimony, there is only speculation that the grind marks on the three guns were all done at the factory because of gaps in the history of each gun.
Further, while Otis England testified that he had seen hand-fitting done at the Savage factory, he also testified that the sear of the accident gun did not look factory finished. Additionally, he testified that Savage would not use a part in a gun if the part's case hardening had been ground away.
Finally, Marvin Williamson testified that he had seen excessive wear on several Savage guns that he had repaired and that the marks on the accident gun appeared to be original factory grind marks. However, Williamson did not testify that he observed original factory grind marks or other evidence of hand-fitting on other Savage guns he repaired. Nor did he testify that wear on other Savage guns he repaired was due to the grinding away of the case hardening on the parts.
Harry Sefried and Robert Greenleaf, both of whom had worked at Savage and were familiar with its practices and procedures[5], *882 testified that the Model 18 was not a handfitted gun. Thus, its parts were not ground or filed at the factory. Robert Greenleaf testified that Savage assemblers were allowed to file burrs from the pieces, but if a part did not fit, the assembler was instructed to send the part back, rather than file or grind the part to make it fit.
Additionally, Benjamin Brown's testimony supports the trial court's conclusion that the plaintiff did not prove that the alterations to the accident gun occurred at the factory. Benjamin testified in his deposition that he filed the sear notch enough to actually remove metal from it and change its shape. Further, he sandpapered the edge of the trigger. Later, at trial, Brown recanted his testimony to a certain extent, stating that he only used a fingernail file on the parts of the gun to clean them and that his brother, Charlie Brown, told Benjamin that he (Charlie) had attempted to repair the gun.
Based on the testimony presented at trial, we cannot say the trial court was clearly wrong in its determination that any alterations to the accident gun were not made at the factory, and therefore, the gun was not unreasonably dangerous due to defects in its construction or assembly.
Because we have affirmed the trial court's finding that the plaintiff has failed to prove that the accident gun was defective in either its design or assembly, it is unnecessary to address plaintiff's remaining assignments of error.[6]

CONCLUSION
For the foregoing reasons, the judgment in favor of the defendant, Savage Industries, Inc., dismissing the claims of the plaintiff, Tony Cappo, is affirmed. Costs of this appeal are assessed to the plaintiff, Tony Cappo.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] Brad Ray did not testify at trial.
[2] Billie Tolbird settled her claim against Savage prior to trial, and Benjamin Brown was dismissed as a defendant during the course of the trial.
[3] Robert Greenleaf testified in his deposition that the accident gun was manufactured in 1959.
[4] Dr. Jordan is a metallurgist. He was not familiar with the gun industry, but merely testified to the hardness of the metals on certain parts of the accident gun.
[5] Robert Greenleaf worked for Savage at the time he gave his deposition, but no longer worked for Savage at the time of trial.
[6] The plaintiff also assigned as error: (1) the trial court's finding that it was just as likely that Brad Ray pulled the trigger as that the accident gun disengaged from the blow to the barrel; and, (2) the trial court's finding that any defect of the Model 18 shotgun was not a contributing factor in causing the death of Robert Cappo under the circumstances of the shooting.