740 So.2d 787 (1999)
Johnny Ray MATTHEWS, et al, Plaintiffs-Appellants,
v.
ARKLA LUBRICANTS INC., Federated Mutual Ins. Co., Steven Robert Rogers, Manpower, and ABC Insurance Co., Defendants-appellees.
No. 32,121-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1999.
*791 Peter R. Flowers, Shreveport, McQuaig & Stelly by Scott McQuaig, Metairie, Counsel for Appellants.
Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Shreveport, Counsel for Appellees.
Before NORRIS, BROWN and KOSTELKA, JJ.
BROWN, J.
Plaintiffs, Johnny Ray Matthews, Dominic Restivo, Wanda Jean Rowell, Kenneth Eugene Watkins, and Mary Joan Owen, filed the instant action seeking wrongful death damages arising out of a two vehicle accident in which several of their family members were fatally injured. The jury rejected plaintiffs' demands, finding that the accident was caused solely by the fault of Ruth Restivo, the driver of the car in which plaintiffs' decedents were passengers. The trial court entered judgment in accordance with the jury's adverse verdict. Following denial of motions for JNOV/new trial, plaintiffs appealed. Finding no error, however, we affirm.

Facts and Procedural Background
On May 27, 1994, Ruth Restivo was returning to Shreveport after visiting her daughter Wanda at her home on Bledsoe Road in Keithville. Passengers in Mrs. Restivo's gray 1986 Oldsmobile Cutlass Cierra were her pregnant granddaughter-in-law Shirley Denise Matthews, her infant great-grandson Kristian Marshal Matthews, and family friend Para Lee Cook. The accident, which resulted in the death of all four occupants of the Restivo vehicle, occurred when Mrs. Restivo, attempting to turn left onto Mansfield Road (also known as La. Highway 171) from Bledsoe Road, was struck by a 1991 Chevrolet pickup truck owned by defendant, Arkla Lubricants, Inc., and driven by defendant, Stephen Robert Rogers, a temporary warehouse employee provided by Manpower Temporary Services, Inc. Rogers was on his way to Zwolle to make a delivery. Hwy. 171 is four lanes with a grassy median separating the south and northbound lanes. Rogers was traveling south in the left-hand or inside lane when the accident occurred.
Thereafter, on December 19, 1994, plaintiffs filed the instant wrongful death action, naming as defendants Stephen Rogers, Arkla Lubricants, its insurer, Federated Mutual Insurance Company, Collier Investments, Inc. d/b/a Manpower Temporary Services, and its insurer, Federal Insurance Company. A jury was empaneled and trial was begun on March 9, 1998. At the close of plaintiffs' evidence, Manpower and its insurer moved for a directed verdict, which was granted by the trial court. Following presentation of the remaining defendants' case, the jury determined that the accident was caused solely by the fault of Mrs. Restivo. Judgment in *792 favor of defendants dismissing plaintiffs' claims was signed on March 27, 1998.
Plaintiffs filed motions for JNOV and new trial. The trial court denied both motions, finding that the jury's verdict was supported by the evidence. The trial court's denial of these post-trial motions is the primary error asserted by plaintiffs on appeal.

Discussion

Denial of Motion for JNOV
Plaintiffs first contend that the jury verdict in favor of defendants is unsupported by sufficient evidence and that the trial court improperly denied their motion for JNOV. According to plaintiffs, it is undisputed that Rogers was speeding and inattentive at the time of the accident and that this negligent behavior was a cause of the accident. Furthermore, because no reasonable jury could have arrived at such a verdict, the trial court should have granted JNOV. Plaintiffs also assert as error the jury's failure to find Arkla Lubricants liable for their injuries under a theory of negligent entrustment.
A JNOV is the procedural device authorized by La.C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir. 1992). JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To determine that the evidence was insufficient as a matter of law requires a finding that no valid line of reasoning and permissible inferences could possibly lead rational persons to the conclusions reached by the jury. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Morehead v. Ford Motor Company, 29,399 (La.App.2d Cir.05/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/07/97), 703 So.2d 1265; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991).
In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all the evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott, supra; Gibson, supra. The trial court does not have the discretion to weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Morehead, supra. All reasonable inferences or factual questions should be resolved in favor of the nonmoving party. Anderson, supra; Chambers v. Graybiel, 25,840 (La.App.2d Cir.06/22/94), 639 So.2d 361, writ denied, 94-1948 (La.10/28/94), 644 So.2d 377.
As noted by this court in Gibson, supra at 1336, the scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case. What the appellate court reviews is the decision of the trial judge, who has attempted to balance the great deference afforded to the jury's verdict against his obligation to insure that substantial justice was accomplished. Appellate review is limited to whether the trial court committed manifest error or was clearly wrong in denying JNOV. Chambers, supra; Gibson, supra.
Fault in a vehicular collision case is determined by judging the conduct of each motorist under the facts and circumstances of each particular case. Crump v. Ritter, 583 So.2d 47 (La.App. 2d Cir.1991), writ denied, 588 So.2d 1113 (La.1991); Soniat v. State Farm Mutual Automobile Insurance Co., 340 So.2d 1097 (La.App. 4th Cir.1976).
A motorist may be negligent if he drives his vehicle at a speed greater *793 than is reasonable and prudent under the existing conditions and for the potential hazards, having due regard for considerations such as the traffic on the roadway, its surface and width, and the conditions of the weather. Coley v. Dept. of Transportation and Development, 621 So.2d 41 (La. App. 2d Cir.1993); Loveday v. Travelers Insurance Co., 585 So.2d 597 (La.App. 3d Cir.1991), writ denied, 590 So.2d 65 (La. 1991). However, the fact that a motorist involved in an accident was speeding does not in and of itself require a finding of liability. Loveday, supra; Bennett v. U.S. Fidelity and Guaranty Co., 373 So.2d 1362 (La.App. 1st Cir.1979), writ denied, 376 So.2d 1269 (La.1979); Bland v. Interstate Fire & Casualty Co., 311 So.2d 480 (La. App. 4th Cir.1975). Instead, as noted by the court in Bland, supra, speed does not directly cause accidents, but rather influences behavior and results in acts or omissions which cause accidents.
It is undisputed that Stephen Rogers was traveling along Hwy. 171 at a speed just over the posted speed limit. A driver on a favored highway has the duty of ordinary care toward drivers entering from side streets. Coleman v. Rabon, 561 So.2d 897 (La.App. 2d Cir.1990), writ denied, 567 So.2d 617 (La.1990); Tatum v. Old Republic Insurance Co., 94-157 (La. App. 3d Cir.10/05/94), 643 So.2d 419, writ denied, 94-2722 (La.01/06/95), 648 So.2d 929. A motorist driving at a reasonable rate on a right-of-way street has a right to assume or presume that a driver approaching from a less favored street will stop for the intersection and yield the right-of-way. Alexander v. Rivers, 560 So.2d 999 (La.App. 4th Cir.1990).
It is also uncontroverted that Ruth Restivo was attempting to proceed across the favored thoroughfare, Hwy. 171, from Bledsoe Road. Traffic on Bledsoe Road was controlled by a stop sign. When a driver is confronted with a stop sign at an intersection, it is her duty to come to a complete stop, to appraise traffic and to make certain that the way is clear before proceeding. Kessler v. Amica Mutual Insurance Co., 573 So.2d 476 (La.1991); Coleman, supra; Vallery v. Dept. of Transportation and Development, 480 So.2d 818 (La.App. 3d Cir.1985), writ denied, 481 So.2d 1350 (La.1986). When a motorist stops her vehicle before entering a right-of-way street, she has performed only half of the duty which the law has imposed upon her. The duty to proceed safely from a stop sign mandates that the driver see what she should have seen with the exercise of due diligence. Eaglin v. State Farm Insurance Co., 489 So.2d 464 (La.App. 3d Cir.1986). She is required to see a vehicle which is traveling on a favored roadway as it approaches her position. Id. To stop and then proceed in the immediate path of an oncoming vehicle constitutes gross negligence. Coleman, supra.
Generally, an owner of a vehicle is not personally liable for damages which occur when another is operating the vehicle. Riser v. Acadiana Limousine Service, Inc., 96-1687 (La.App. 3d Cir.04/30/97), 693 So.2d 330, writ denied, 97-1420 (La.09/19/97), 701 So.2d 173; Jones v. Western Preferred Casualty Co., 633 So.2d 667 (La.App. 1st Cir.1993), writ denied, 94-0273 (La.04/04/94), 635 So.2d 1123; Harris v. Hamilton, 569 So.2d 1 (La.App. 4th Cir.1990); Friday v. Mutz, 483 So.2d 1269 (La.App. 4th Cir.1986). The exceptions to this rule are when the driver is on a mission for the owner of the vehicle, when the driver is an agent or employee of the owner, and when the owner is himself negligent in entrusting the vehicle to an incompetent driver. Riser, supra; Jones, supra; Harris, supra.
Under the negligent entrustment theory, the lender of a vehicle is not responsible for the negligence of the borrower unless he had or should have had knowledge that the borrower was physically or mentally incompetent to drive. Kemp v. Fourmy, 265 So.2d 651 (La.App. 2d Cir.1972); Riser, supra; Jones, supra. *794 An owner of a vehicle who knowingly entrusts it to an incompetent driver is responsible for the harm resulting from the incompetent operation of the vehicle. Riser, supra; Jones, supra; Pereira Enterprises, Inc. v. Soileau, 551 So.2d 39 (La. App. 3d Cir.1989); Danos v. St. Pierre, 383 So.2d 1019 (La.App. 1st Cir.1980), affirmed, 402 So.2d 633 (La.1981). However, absent a reason which would place the owner on notice of the borrower's disability or incompetence, there is no duty to make an inquiry into one's driving habits or record. Riser, supra; Jones, supra.
Applying the above legal principles, we find no error in the trial court's denial of JNOV.
The following testimony was elicited at trial. Caddo Parish Sheriffs Deputy James Hatfield was one of the first to respond to the accident scene. Deputy Hatfield was able to determine that prior to impact, the truck driven by Rogers was traveling south on Hwy. 171 and Mrs. Restivo's car was heading east on Bledsoe Road. Hwy. 171 is four lanes and the collision occurred in the lefthand, inside lane of Hwy. 171. The posted speed limit was 55 m.p.h. Deputy Hatfield interviewed a shaken Stephen Rogers at the scene. Rogers related to the deputy that he was traveling at an approximate speed of 60 m.p.h. and that he didn't see the car until it was in the roadway. Rogers stated that he braked immediately upon seeing Mrs. Restivo's vehicle, leaving 20 feet of skid marks, but the accident was unavoidable.
Plaintiffs next called Stephen Rogers on cross-examination. Rogers testified that at the time of the accident, he had been temporarily assigned by Manpower to work in the warehouse at Arkla Lubricants. On May 27, 1994, the warehouse supervisor, Jeff Guilbeau, asked him to drive a company pickup to deliver a drum of antifreeze, some oil, filters and hydraulic fluid to a customer in Zwolle. Guilbeau gave him directions and Rogers left the warehouse around lunchtime.
Rogers stated that he was driving south on Hwy. 171 in the left or inside lane of the four-lane highway at approximately 60 m.p.h. He noted that there was a car in the right lane approximately 50-100 feet ahead of him. He was able to see the Bledsoe Road intersection and noted that there was better visibility the closer he got to the intersection. Rogers stated that at a greater distance from the intersection, his view was impeded by trees and the difference in the elevations of Bledsoe Road and the highway. Rogers testified that he did not see Mrs. Restivo's car until she was about even with the stop sign on Bledsoe Road and entering into the intersection.
In an attempt to impeach his testimony, plaintiffs' counsel asked Rogers whether what he told Danny Price, a former employee of Arkla Lubricants, was true (that Rogers had been flirting and playing "cat and mouse" with a cute blonde nurse in the car in front of him and thus was inattentive). Rogers denied even speaking with Price about the accident.
Rogers testified that immediately after the accident, he called his supervisor at Arkla Lubricants, Jeff Guilbeau. According to Rogers, upon his arrival at the scene, Guilbeau peeled a sticker off the antifreeze drum and advised him to tell the police that he was not speeding at the time of the accident, something that Rogers refused to do.
Danny Price, who at the time of the accident was employed as a truck driver with Arkla Lubricants, testified that one or two days after the accident, he went on a delivery with Rogers, and they talked about the accident. According to Price, Rogers related that on the date of the accident, he and a blonde nurse, also southbound on Hwy. 171, were flirting and playing "cat and mouse," speeding up, slowing down, changing lanes, etc. While Rogers was looking at the girl, he happened to turn his head and look back up; at that time, the gray car driven by Mrs. Restivo was there and he didn't have time to brake or do anything else.
*795 On cross-examination, Price testified that several months after the accident, he terminated his employment with Arkla Lubricants because of several arguments he had with Guilbeau, his supervisor. According to Price, it was the morning after the accident that he and Rogers made a delivery together. Defense counsel pointed out that the accident occurred on a Friday and that Rogers never worked weekends and was off for ten days after the incident. Price stated that he has heard "through the grapevine" that he was related to one of the ladies in the accident, Mrs. Restivo, and plaintiff Johnny Ray Matthews. Defense counsel also elicited that Price was mad because while employed at Arkla Lubricants, his wages were garnished for child support and he had been written up for excessive tardiness.
As their expert in accident reconstruction, plaintiffs presented the testimony of Thomas Boster, a self-employed consulting safety engineer. Dr. Boster stated that in reconstructing the accident, he reviewed the accident report, photos of the vehicles and depositions of defendants' expert witness, Mike James, as well as those given by Stephen Rogers, Danny Price and Walter Bison, the only eyewitness to the accident. Dr. Boster also visited the accident scene.
Dr. Boster testified that the accident was a "T-bone type" interaction-the front of the truck driven by Rogers hit the driver's side of the Restivo vehicle. According to Dr. Boster, Mrs. Restivo had started into the roadway of Hwy. 171 at a speed of approximately 20 m.p.h. when she was struck by Rogers' truck, which was traveling at a speed of approximately 62 m.p.h. Other than the testimony of Rogers, there was no evidence of braking on the part of the Restivo car. There is evidence of braking on the part of Rogers; the truck left 20 feet of skid marks prior to the point of impact. Dr. Boster calculated that prior to braking, Rogers' speed was approximately 65 m.p.h.
According to Dr. Boster, Mrs. Restivo stopped at the stop sign. This conclusion he believed was consistent with the car's speed at the time of impact. Dr. Boster opined that the Restivo vehicle would have been able to start from a standing stop, and in a normal acceleration, move up to the point of impact.
Dr. Boster noted that where Bledsoe Road intersects with Mansfield Road, the inferior roadway is lower; there is a "ramp" on Bledsoe Road which inclines to the edge of Hwy. 171. He believed that had Mrs. Restivo been traveling 20-30 m.p.h. and run through the stop sign as related by Rogers and Walter Bison, her car would have been airborne.
Dr. Boster noted that if there had been a vehicle 50-100 feet in front of Rogers as he testified, Mrs. Restivo's view of Hwy. 171 and her ability to see Rogers' truck would have been momentarily obscured. According to Dr. Boster, had Rogers been going the posted speed limit of 55 m.p.h., the accident would not have occurred. He emphasized that 3/10 of a second would have made the difference and would have allowed Mrs. Restivo to clear the intersection. Dr. Boster pointed out that Rogers' truck was turned slightly to the left immediately prior to impact, which was either a panic maneuver or a result of his attempting to turn back to the right.
On cross-examination, Dr. Boster stated that absent witness testimony, he is unable to tell anything about the path that either vehicle took 200 feet or more prior to the point of impact. Dr. Boster conceded that Rogers was on the favored roadway and that Mrs. Restivo had a stop sign which was in plain view.
Dr. Boster noted that the physical evidence supports Rogers' statement that he was traveling in the inside southbound lane of Hwy. 171 for at least 250-300 feet prior to the accident. He also conceded that Danny Price's testimony that Rogers was looking at a blonde nurse in a car to his left would have put her vehicle *796 on the grass median or inside shoulder unless Rogers had previously made a lane change, something there was no testimony to support. Dr. Boster stated that this would be the only way to reconcile Rogers' and Price's testimony, notwithstanding Rogers' vehement statement that he had been in the left southbound lane as far back as Lucent Technologies with his cruise control set on 58 or 59 m.p.h.
Dr. Boster noted Rogers' testimony that he saw Mrs. Restivo's brake lights applied irregularly as if she was stopping and starting; this should have caused Rogers to slow his vehicle down. Dr. Boster discounted Rogers' testimony, however, because he felt that given the car's speed of 20 m.p.h. at the time of impact, it would have been difficult for Mrs. Restivo to have stopped and started, assuming that she had stopped at the stop sign on Bledsoe Road. Dr. Boster conceded, however, that it was possible that Mrs. Restivo did not stop at the stop sign, but was traveling at a faster rate, then applied her brakes, which is consistent with both Rogers' and Bison's testimony.
Although Rogers testified that he turned his steering wheel to the right when he saw Mrs. Restivo in his path, the physical evidence suggests that he turned to the left. However, many drivers faced with a sudden emergency situation are unable to recall what they did in response. Dr. Boster noted that if Mrs. Restivo ran the stop sign, Rogers' perception and reaction time would have been considerably less, by almost two and one-half times.
Plaintiffs next called Jeff Guilbeau on cross-examination. Guilbeau testified that he works for Industrial Oils Unlimited, the entity formerly known as Arkla Lubricants. At the time of the accident, he was the warehouse supervisor. His duties included blending of oils, scheduling of routes and customer service. Guilbeau testified that temporary warehouse help such as Rogers usually did not drive company vehicles. However, if necessary, warehousemen could drive a company pickup. When he asked Rogers on the date of the accident to drive a load to Zwolle, it was because all of the drivers were out of the warehouse at the time. He noted that Rogers had a valid driver's license and was only going to be driving a half-ton pickup truck, not a larger delivery truck. Also, he was a good worker, looked responsible and had made deliveries in the pickup before. Rogers' load consisted of ten cases of oil, some filters and a 55-gallon drum of anti-freeze. Guilbeau advised Rogers to drive safely, wear a seat-belt, obey the speed limit and not play the radio too loud.
Guilbeau testified that he went to the accident scene as soon as he got Rogers' call. He denied telling Rogers to lie about his speed and stated that if that was what Rogers said on the stand, "he was mistaken." Guilbeau also denied tearing the label from the drum of anti-freeze in the back of the truck. Contrary to Rogers' testimony, Guilbeau denied firing Rogers as a result of the accident. According to Guilbeau, the wreck had nothing to do with Rogers' dismissal.
As for Danny Price, Guilbeau stated that Price left his position with Arkla Lubricants to go to work for the school board. Although Price left voluntarily, Guilbeau testified that he would have probably been fired eventually because he was absent or late a lot and was unreliable. According to Guilbeau, Price wasn't a "team player." Guilbeau himself is now in customer service, a position he was transferred to following the accident. Although he at first took a pay cut, Guilbeau stated that he was currently making more than he did as warehouse supervisor.
In presenting their case, defendants first introduced the videotaped deposition of Walter Bison.[1] Bison, who was 84 years *797 old when the accident occurred, owns a home near the intersection of Bledsoe and Mansfield Roads. Bison noted that his front porch faces the intersection. Bison recalled witnessing the accident. He stated that on the date of the incident, he was sitting on his front porch getting ready to eat a sandwich. Bison stated that he didn't see the gray car until it was in the intersection. However, it was his testimony that the car, which had been eastbound on Bledsoe Road, failed to stop at the stop sign. Bison estimated the car's speed to be 45-50 m.p.h. when it entered the intersection. According to Bison, the truck driven by Rogers, which was southbound on Mansfield Road, was going approximately 45 m.p.h. at the time of the accident.
Bison did not recall giving a statement to a police officer at the scene of the accident, but noted that he probably did, he just couldn't remember it. Bison stated that on the date of the accident he spoke with the young man who had been driving the truck. Rogers, who appeared to be in shock, told him that he had his truck set on cruise control when the accident occurred. Bison opined that there was nothing Rogers could have done to avoid the accident.
Bison, who wears glasses, noted that his vision is 20/20 with his glasses on and stated that he wears them all the time. Bison noted further that there was nothing to obstruct his clear view of the intersection. Bison related that he didn't see anything until the wreck and that had he been the driver of the truck, he would have "just shut his eyes, held on and hoped for the best." He reiterated that there was no evasive action Rogers could have taken to avoid hitting Mrs. Restivo.
On cross-examination, Bison stated that he heard a noise, which is when he looked up and saw the accident. On redirect, Bison stated that he thinks he saw both vehicles prior to impact because (the way that his porch is) he was looking at the intersection. However, all he recalls for certain is that he heard the impact.
Next, defendants recalled Deputy Hatfield, who went through the accident report with the jury. Rogers told Dy. Hatfield that as he was driving southbound on Hwy. 171 at a speed of about 55-60 m.p.h., he neared the intersection and the first thing he saw was taillights of a car that had pulled out in front of him from Bledsoe Road. According to Rogers, the driver applied her brakes as if she decided to try to stop, then changed her mind. Rogers stated that the car was just right in front of him and he could not avoid hitting it. Rogers told the deputy that the driver of the car ran the stop sign and pulled into his path, then applied the brakes as if she had just seen his truck. Deputy Hatfield noted that the stop sign on Bledsoe Road was clearly visible to traffic approaching the intersection from the west.
Deputy Michael McDaniel also responded to the accident scene. Rogers told him that he was southbound on Mansfield Road when the gray Cutlass ran the stop sign at Bledsoe Road and drove in front of him. Rogers also stated that although he tried, he was unable to avoid the accident.
Deputy McDaniel interviewed the only eyewitness, Walter Bison, who at the time of the accident, lived across the intersection. Bison stated that he was sitting on his front porch when he saw the gray Oldsmobile driven by Mrs. Restivo run the stop sign at Bledsoe Road and pull out into the intersection at a speed of approximately 35 m.p.h. Mr. Bison related that he saw the accident occur and that Rogers was unable to avoid the impact. Dy. McDaniel noted that Bison's account of the accident was consistent with the statement given by Rogers.
Stephen Rogers testified that prior to the accident, during his temporary employment with Arkla Lubricants, he had made several other deliveries in the truck involved *798 in the accident. He noted that he had extensive experience driving pickup trucks such as the one he was driving on May 27, 1994. On that date, he was in the left inside lane of Hwy. 171 heading south with his cruise control set on about 58-59 m.p.h. At a distance of approximately 300 feet from the intersection, there was another vehicle in front of him in the right lane traveling at a speed of about 55 m.p.h.
Rogers stated that when he saw Mrs. Restivo's vehicle, it was proceeding through the stop sign at approximately 25-30 m.p.h. The gray car was not airborne. Rogers testified that he saw brake lights, so he knows that Mrs. Restivo tried to stop or slow down once she saw him. He tried to avoid hitting the car; he remembers turning the steering wheel and locking his brakes. Rogers explained to deputies on the scene how the accident occurred. Rogers testified that while employed with Arkla Lubricants, he never worked on weekends and that the accident occurred on a Friday. Following the accident, he was off for about ten days. Rogers vehemently denied telling Danny Price that he was inattentive because he was flirting with a blonde nurse in another vehicle just prior to the accident. Rogers also denied going on any set-ups or deliveries with Price.
On cross-examination, Rogers stated that he did not see Mrs. Restivo's car until he was about 30 feet from the intersection because there was another vehicle 50-100 feet in front of him. Rogers reiterated that he neither went anywhere nor had a conversation about the accident with Danny Price. Rogers also noted that after the accident, he was fired by Arkla Lubricants.
Defendants' expert was Dr. Mike James, a civil and mechanical engineer who has reconstructed over 1100 accidents. Dr. James stated that one of the first steps in reconstructing an accident is to visit the accident scene, measure the roadway, perform a survey and take photographs, which is how he began his investigation in the instant case. Dr. James also reviewed the accident report, depositions, diagrams made of the accident scene, and laser copies of the damaged vehicles.
Dr. James noted that Bledsoe Road is somewhat lower than Hwy. 171, with a gradual incline from the inferior roadway onto Hwy. 171. Within 500 feet of the intersection, Stephen Rogers' truck was in the inside left lane heading south toward the intersection; Dr. James noted that his expert conclusion was based upon the physical evidence as well as Rogers' testimony. Given the damage to the vehicles, the condition of the roadway, the grassy median and the resting position of both vehicles, Dr. James concluded that Rogers' speed pre-impact was approximately 55-59 m.p.h. This conclusion was also based upon his use of the SMAC program, which is the most accurate computer program for the reconstruction of speeds of vehicles involved in accidents. Dr. James noted that the program used by plaintiffs' expert, EDSMAC, is a spin-off and has been superseded by the better, more versatile SMAC.
Photographs show that Rogers left 20 feet of tire skid marks which turn to the left prior to the point of impact. The fact that Rogers observed brake lights, or the Restivo vehicle slowing, means that the speed of the car at some point between the point of impact and the stop sign was greater. Dr. James conceded that it is possible to attain a speed of 18-20 miles per hour from a stopped position at the stop sign to the point of impact under moderate to heavy acceleration. However, it is also very possible that the Restivo vehicle was going faster prior to impact. Inasmuch as the speed of Mrs. Restivo's car was 18-20 m.p.h. at impact, and given Rogers' testimony that he saw her brake prior to impact, Dr. James firmly opined that the car was going faster than 18-20 m.p.h. pre-impact. Although Mrs. Restivo's speed prior to impact can not be determined with exactitude, if she was traveling 25 m.p.h. or faster, then it is likely that she ran the stop sign on Bledsoe Road.
*799 When asked about Dr. Boster's ramping theory, which was revealed for the first time during his trial testimony, Dr. James was critical. After Dr. Boster's testimony, Dr. James revisited the accident scene and drove a vehicle approximately the same size and weight as the Restivo vehicle through the stop signs at speeds of 25 and 33 m.p.h. Dr. James' test was videotaped and played for the jury. As the tape reflects, at no time did the car go airborne during the test.
Dr. James testified that if the gray car had been proceeding across the highway when it stopped suddenly (as testified by Rogers), it would have created confusion for a southbound motorist such as Rogers. He found no fault on the part of Rogers for turning to the left instead of right because Rogers' reaction was in response to an emergency situation. From Rogers' perspective, opined Dr. James, the accident was unavoidable.
On cross-examination, Dr. James stated that from a distance of about 320 feet, a motorist southbound on Hwy. 171 could see a car stopped on Bledsoe Road, assuming there are no other vehicles before him on the highway. Dr. James emphasized that even if a driver could see a car stopped at the stop sign on the inferior roadway, he would have no way of knowing that the car would drive out in front of him on the highway.
Dr. James stated that it was possible that Mrs. Restivo could have stopped at the stop sign and achieved a speed of 18 m.p.h. prior to impact. However, because of Rogers' testimony that he observed Mrs. Restivo braking, he opined that the gray car was traveling at a higher speed prior to impact.
The foregoing testimony shows conflicting theories regarding how the accident occurred. What is undisputed, however, is that the accident would not have happened had Mrs. Restivo not pulled out into the intersection in front of Rogers. Clearly, there is sufficient evidence to support the jury's finding that neither Stephen Rogers nor Arkla Lubricants was negligent and that the accident was caused solely by the fault of Mrs. Restivo. In light of the record viewed in its entirety, we are unable to say that the trial court erred in denying plaintiffs' motion for JNOV. The jury's finding is reasonable and its verdict is neither manifestly erroneous nor clearly wrong. Therefore, the jury's finding that defendants were not at fault in causing plaintiffs' injuries will be maintained.

Exclusion of Testimony
Plaintiffs urge that the trial court erred in failing to allow them to question Stephen Rogers about a misdemeanor conviction under Louisiana's open container law.
La. C.E. art. 103(A) provides that error may not be predicated upon a ruling admitting or excluding evidence unless a substantial right of the party is affected. In reviewing evidentiary decisions of the trial court, the appellate court must consider whether the particular ruling complained of was erroneous and if so, whether the error prejudiced the complainants' cause, for unless it does, reversal is not warranted. Cash v. K.C.I. Construction, Inc., 95-1083 (La.App. 5th Cir. 05/15/96), 675 So.2d 297, writ denied, 96-1811 (La.10/25/96), 681 So.2d 369; Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir. 03/11/94), 633 So.2d 903, writ denied, 94-0806 (La.05/06/94), 637 So.2d 1056.
What plaintiffs sought to show with this line of questioning was that Rogers lied about his open container violation during his deposition and that his deliberate refusal to disclose an arrest for having an open container in his vehicle is directly related to the issue of his truthfulness, credibility or veracity. We note, however, that Rogers eventually admitted to the misdemeanor conviction during his deposition. In excluding this evidence, the court found that its probative value was outweighed by its prejudicial effect. The court's ruling on this inconsequential issue, even if error, can only be characterized as *800 harmless.[2] This assignment of error is without merit.

Denial of Batson Challenge
After defendants used all six of their peremptory challenges to excuse African-Americans from the jury (five of which also were directed at African-American females), plaintiffs asserted a Batson challenge, urging that defense counsel's pattern of discriminatory juror selection violated the United States Equal Protection Clause of the Fourteenth Amendment.
Equal protection prohibits the peremptory challenge of a prospective juror based on race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Bourque, 96-0842 (La.07/01/97), 699 So.2d 1, U.S. cert. denied, ___ U.S. ___, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). Batson has recently been extended to afford protection to other categories such as gender. J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); Bourque, supra.
Furthermore, Batson is not limited to criminal matters. A private litigant in a civil case may not use peremptory challenges to exclude jurors on account of race. Edmonson v. Leesville Concrete Company, Inc., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); Lee v. Magnolia Garden Apartments, 96-1328 (La. App. 1st Cir. 05/09/97), 694 So.2d 1142, writ denied, 97-1544 (La.09/26/97), 701 So.2d 990. A civil litigant may raise the equal protection claim of a person whom the opposing party has excluded from jury service on account of race. Edmonson, supra; Smith v. Lincoln General Hospital, 27,133 (La.App.2d Cir.06/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3.
To make a Batson challenge, the litigant must first make a prima facie case of discrimination by showing a pattern of strikes against members of a particular race. Edmonson, supra; Smith, supra. Once the litigant makes his prima facie case, the burden shifts to the opposing party to come forward with a neutral explanation for challenging the black venire members. In other words, counsel must articulate a neutral explanation related to the particular case to be tried. Batson, supra; Smith, supra; Lee, supra. A neutral explanation is one which is based on some factor other than the race of the juror excused. Id. The explanation need not rise to the level of a challenge for cause, but must be more than the vague belief that the prospective juror would vote a certain way because of his or her race. State v. Brown, 29,708 (La.App.2d Cir.09/24/97), 702 So.2d 744, writ denied, 97-2549 (La.01/30/98), 709 So.2d 703; Smith, supra; State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied, 594 So.2d 1317 (La.1992).
With the opposing party's prima facie case and the challenging party's rebuttal, the trial court must determine whether the objector has established purposeful discrimination. Brown, supra; Smith, supra. The trial court's conclusion on the ultimate question of discriminatory intent, which is a question of fact resting largely on a credibility determination, is accorded great deference on appeal. Batson, supra; State v. Collier, 553 So.2d 815 (La.1989); Smith, supra.
As noted above, defense counsel exercised all of his peremptory challenges against African-Americans, five of whom were female. On this showing, the trial court correctly found that plaintiffs made a prima facie case of discrimination. We must therefore determine whether the court erred in finding that the jurors were excused for racially neutral reasons and *801 that there was thus no showing of purposeful discrimination.
The first African-American female to be excluded was Vicki Waller. Because this was the first of defendants' peremptory challenges, the trial court correctly noted that no pattern of discrimination had been established and that no racially neutral reason for Ms. Waller's exclusion from the jury was necessary. Thereafter, however, defense counsel used his second peremptory challenge to excuse another black female, LaToya Tasby, from the jury. Defense counsel's reason for excluding Ms. Tasby from service on the jury was that she had lost her mother and a child and had an extremely close relationship with her young son. Defense counsel articulated his concern that Ms. Tasby's loss and her relationship with her son would cause her to make findings sympathetic to plaintiffs. Clearly, the possibility of bias in favor of plaintiffs is a racially neutral ground for her challenge. See State v. King, 604 So.2d 661 (La.App. 1st Cir.1992).
Lavette Carter was excluded by defense counsel based upon her indication on her juror response form that she had been convicted of aggravated battery. Ms. Carter's criminal record is a legitimate race-neutral explanation for her exclusion. State v. Banks, 96-652 (La.App. 5th Cir. 01/15/97), 694 So.2d 401; State v. Dabney, 91-2051 (La.App. 4th Cir. 03/15/94), 633 So.2d 1369, writ denied, 94-0974 (La.09/02/94), 643 So.2d 139.
Defense counsel's reason for excusing LaKeia Persley, a student at Northwestern State University, was that it was mid-term week and he felt that her school studies would preclude her from giving her full attention to the trial. This is also a racially neutral ground for exercising a peremptory challenge. See State v. Rose, 606 So.2d 845 (La.App. 2d Cir. 1992).
As for Johnny Lattin, defense counsel noted that he was actually rated favorably by the defense because of his position as a manager, but not as favorably as a subsequent juror, Mr. Harrison, who voiced conservative comments about jury trials. According to defense counsel, he chose to excuse Mr. Lattin rather than the higher rated, more conservative Mr. Harrison.
Regarding Phyllis Williams, defense counsel noted that he used his final peremptory challenge to exclude her because there were other jurors such as Mr. Harrison who had more conservative, defense friendly views. As for counsel's decision to challenge Mr. Lattin and Ms. Williams and accept Mr. Harrison, the fact that a party's attorney excuses persons with a particular characteristic and not another similarly situated person does not in itself show that the explanation was a mere pretext for discrimination. Rather, as noted by the court in Lee, supra, the accepted juror may have exhibited traits which the challenging party could have reasonably believed would make him desirable as a juror. See also Collier, supra; State v. Hampton, 27,703 (La.App.2d Cir.02/28/96), 670 So.2d 1349, writ denied, 96-1063 (La.11/15/96), 682 So.2d 758.
We find no abuse of the trial court's discretion in accepting the explanations offered by defense counsel for his exercise of peremptory challenges. This assignment lacks merit.

Denial of Motion for New Trial
Plaintiffs' final assignment of error urges that the trial court erred in denying their motion for new trial.
La. C.C.P. art. 1972 provides in part that a new trial shall be granted upon the contradictory motion of any party when the verdict or judgment appears clearly contrary to the law and the evidence or when the jury has behaved so improperly that impartial justice has not been done. Parker v. Centenary Heritage Manor Nursing Home, 28,401 (La.App.2d Cir.06/26/96), 677 So.2d 568, writ denied, *802 96-1960 (La.11/01/96), 681 So.2d 1271. As for the first ground, a new trial may be granted when the jury's verdict, while free of legal error, does not do substantial justice or is against the manifest weight and probative effect of the evidence. Gilley v. Wendy's, Inc., 31,353 (La.App.2d Cir.12/09/98), 723 So.2d 517. The denial of a motion for new trial is discretionary with the trial court and should not be reversed unless there has been an abuse of that discretion. Taylor v. American Laundry Machinery, Inc., 27,121 (La.App.2d Cir.06/23/95), 658 So.2d 288, writ denied, 95-1877 (La.11/03/95), 661 So.2d 1385; Chambers, supra; Gibson, supra.
Plaintiffs first urge that the jury's verdict finding no negligence on the part of defendants is clearly contrary to the law and evidence and that the trial court erred in concluding otherwise. As we have previously pointed out, however, the jury's verdict finding that the accident was caused solely by the fault of Mrs. Restivo is supported by the record. Therefore, the verdict is not clearly contrary to the evidence. Furthermore, we find no indication that the verdict is contrary to law.
Regarding the second ground asserted by plaintiffs, which is that Stephen Rogers had unauthorized communications with the jury which tainted their verdict, we note that improper behavior by a juror or jury is not defined, but must be determined by the facts and circumstances of each particular case. Parker, supra; Uriegas v. Gainsco, 94-1400 (La.App. 3d Cir.09/13/95), 663 So.2d 162, writ denied, 95-2485 (La.12/15/95), 664 So.2d 458. The possibility that a jury's decision making process was tainted by an outside influence should not be overlooked as insignificant. Parker, supra; Uriegas, supra. However, not every instance of jury misconduct necessitates the granting of a new trial. Id. Instead, a new trial is mandated only upon a showing that the jury misconduct was of such a grievous nature as to preclude the impartial administration of justice. Id.
According to plaintiffs, the jury's verdict in this case was tainted by statements allegedly made by Stephen Rogers in the break/smoke room which may have been overheard by some of the jurors.[3] The trial court conducted a hearing upon plaintiffs' motion and heard from the jury foreman who stated that he had no knowledge of any statements made by Rogers which were addressed to or overheard by members of the jury and denied that the jury's verdict was the product of tampering or improper influence. The foreman also signed an affidavit to this effect.[4]
In denying a new trial on the basis of Rogers' allegedly improper contact with the jury, the trial court noted the following:
[W]e have the testimony ... by Mr. Matthews ... and by ... Mr. Lillie (a friend of plaintiff Matthews) ... that some contact took place. We also have the affidavit of the foreman of the jury that nothing took place. The Court believes that if anything took place it was so inconsequential that the foreman of the jury doesn't remember it. The Court also frankly believes that had anything taken place that could reasonably have been thought to influence the jury... it would have been brought to the *803 Court's attention ... I think after the fact sometimes when you're faced with an unpleasant result and decision the weight that you give something that occurred may change in the aftermath. But I believe in looking at their (Matthews and Lillie's) testimony and Mr. Peters (the foreman of the jury) that nothing significant occurred that affected the outcome of the trial.... There may have been some minor contact. It would have been better if it hadn't occurred. It would have been better still if it had been brought to the Court's attention at the time and the Court could have given an instruction on it.... As I said, again, the foreman of the jury... was named as one of the people who supposedly heard that said that it (improper contact or communication) didn't occur.
In this case, the trial court properly doubted that any improper contact occurred but even if it did, it would not have constituted behavior of such a grievous nature as to preclude the impartial administration of justice. We find no error in the trial court's denial of plaintiffs' motion for new trial on this issue.

Conclusion
For the reasons set forth above, the judgment of the trial court is AFFIRMED. Costs are assessed to plaintiffs-appellants.
NOTES
[1] The deposition of the elderly Bison was taken four months post-accident. Because at the time of trial Bison was residing in a nursing home, his videotaped deposition was introduced in lieu of his live testimony.
[2] Furthermore, not only did plaintiffs fail to lay a proper foundation for this line of questioning in accordance with La. C.E. art. 609, but violation of the open container law is a misdemeanor, which is not a crime punishable by imprisonment in excess of six months, as required by La.C.E. art. 609(A)(1).
[3] Specifically, plaintiffs assert that during the trial, on Tuesday, March 10, 1998, while plaintiff Johnny Ray Matthews was in the break area smoking a cigarette with three male jurors and one female juror, Stephen Rogers said to them that "it should be obvious to the jurors who was lying on the witness stand during this trial." Also, on Wednesday, March 11, 1998, while Matthews was in line at the snack shop on the first floor of the courthouse, Rogers approached him and, in front of at least one male juror, tried to apologize for the accident.
[4] Interestingly, plaintiffs, who were aware of Rogers' alleged statements to or in front of members of the jury, did not bring this allegedly improper contact to the judge's attention until after the jury's adverse verdict was rendered.